# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

## 05-80339

CASE NO. _____

CIV-MIDDLEBROOKS

MAGISTRATE JUDGE
JOHNSON

**FLORIDA WILDLIFE FEDERATION**, a Florida not-for-profit corporation; and **SIERRA CLUB, INC.,** a not-for-profit corporation,

                    Plaintiffs,

v.

**UNITED STATES ARMY CORPS OF ENGINEERS**, and **COLONEL ROBERT M. CARPENTER**, District Engineer, in his official capacity,

                    Defendants.

_____/

## COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, **FLORIDA WILDLIFE FEDERATION** and **SIERRA CLUB**, (collectively "Plaintiffs"), by and through their undersigned counsel, hereby sue the **UNITED STATES ARMY CORPS OF ENGINEERS**, and **COLONEL ROBERT M. CARPENTER**, District Engineer, for improper agency action under the **Administrative Procedures Act,** 5 U.S.C. §706 ("APA"), violations of the **National Environmental Policy Act,** ("NEPA") 42 U.S.C. §4321, *et seq.*, and violations of the **Federal Clean Water Act,** ("CWA") 33 U.S.C. §1344 *et seq.* and the **Rivers And Harbors Act of 1899,** 33 U.S.C. §403, and state:

1.      This is an action for declaratory judgment and injunctive relief. The Plaintiffs are challenging the United States Corps of Engineers' ("Corps") decision to issue a 404 Permit, **No.: SAJ 2004-2859 (IP-AAZ)** (the "PERMIT"), pursuant to the Federal Clean Water Act and the Rivers And Harbors Act of 1899 for a project known as the Palm Beach County Biotechnology Research Park - SCRIPPS (the "PROJECT"). This action also challenges the sufficiency and validity of the Corps' Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI") and decision not to prepare, or require the preparation of, an Environmental Impact Statement ("EIS") pursuant to the requirements of NEPA and its implementing regulations. This action also challenges all of the Defendants' final agency actions with respect to the PROJECT under the **Administrative Procedures Act,** 5 U.S.C. §706 ("APA"). A copy of the Memorandum for Record is attached hereto as Exhibit "A."

2.      The PROJECT consists of work and/or activities within Waters of the United States that are regulated by the Corps pursuant to Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbor Act of 1899. The issuance of the PERMIT is a major Federal action which requires the Corps to conduct a statutory NEPA analysis and prepare the appropriate NEPA documents.

3.      The Corps conducted an Environmental Assessment for the PROJECT and made a Finding of No Significant Impact and concluded that no Environmental Impact Statement would need to be prepared. This decision, under the circumstances, is unreasonable, arbitrary, capricious and otherwise not in accordance with federal law.

4.      The Corps' EA unlawfully segments and permits a small part of a single large development project to hide direct, indirect, cumulative and secondary adverse impacts and:

a.  fails to adequately identify secondary impacts of either the permitted PROJECT or the entire development;

b.  fails to adequately identify and properly evaluate alternatives for either the permitted PROJECT or the entire development;

c.  fails to adequately identify the degree of mitigation necessary to off-set the direct, indirect, cumulative and secondary impacts of either the PROJECT or the entire development;

d.  fails to adequately evaluate the direct, indirect, cumulative and secondary harm to threatened and endangered species and habitat for either the permitted PROJECT or the entire development;

e.  fails to note, acknowledge, or factor into the analysis, the five-phase, 2000 acre, 2000 – plus home, 8.5 million square foot industrial, and one-half million square foot retail Palm Beach County Biotechnology Research Park Development of Regional Impact application, and enabling Palm Beach County Comprehensive Plan, Land Development Regulation and Development Order changes made by the applicant, prior to the FONSI, in furtherance of the entire development;

f.  fails to undertake an independent analysis of the water quality certification issues; and

g.  fails to note, acknowledge or factor into the analysis the significant public outcry and controversy (including ongoing legal challenges) surrounding the potential impacts of the entire PROJECT or the entire development and the substantial question and uncertainty regarding the impact of either the permitted PROJECT or the entire development.

5.    Based upon the foregoing, the Corps' wholly inadequate and legally deficient EA cannot properly form the basis for the FONSI decision, the decision not to prepare an EIS, or the decision to issue the PERMIT for the PROJECT under applicable Federal laws.

## JURISDICTION

6.    This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 (federal question); under, 5 U.S.C. §§ 702 and 706(1),(2)(A),(C),(D) (Administrative Procedure Act); under

28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs) and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

7.      An actual justiciable controversy now exists between the parties in which the Plaintiffs are entitled to the relief sought herein to redress the harm Plaintiffs are suffering and would otherwise continue to suffer if such relief were not granted.

8.      Defendants **UNITED STATES ARMY CORPS OF ENGINEERS** and **COLONEL ROBERT M. CARPENTER**, as the District Engineer, in his official capacity, have waived sovereign immunity pursuant to 5 U.S.C. § 702.

## VENUE

9.      Venue is proper in this district under 28 U.S.C. § 1391(b) as the actions giving rise to this claim and its effects occur in the Southern District of Florida; 28 U.S.C. § 1391(e) because it is a civil action against an agency and/or officers or employees of an agency of the United States acting in their official capacities and under 5 U.S.C. § 703.

## PLAINTIFFS

10.     Plaintiff Sierra Club is a non-profit corporation with approximately 700,000 members in chapters and groups in all 50 States, including approximately 30,042 members in Florida. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth and to educate and enlist humanity to protect and restore the quality of the natural and human environment. Sierra Club and its members are actively involved in species and habitat protection in Florida and throughout the country, as well as water quality, air quality and environmental justice issues. Sierra Club has been actively

4

working to preserve and restore the Everglades ecosystem. Sierra Club brings this action on its own institutional behalf, and also on behalf of its members, who have regularly, and will continue to, hike, fish, birdwatch, and otherwise enjoy the natural beauty and abundance of wildlife in the Everglades ecosystem, including wildlife that utilize wetlands and uplands that will be impacted by the activities authorized by defendants. The ability of Sierra Club and its members to engage in educational, recreational and advocacy activities in this area is injured by the Corps' failure to comply with the ESA, the CWA, NEPA, and the APA, because, by violating these statutes, the agency is authorizing the loss of wetlands, the reduction in wildlife numbers and habitat, the destruction of migratory birds, nests, and eggs, and is preventing the recovery of, and hastening the extinction of threatened and endangered species enjoyed by Sierra Club members. Sierra Club has submitted numerous comments with respect to this project at the Mecca Farms site.

11.     Florida Wildlife Federation, Inc. ("FWF") is a private, statewide, non-profit citizen's conservation education organization. FWF was formed in 1937 and incorporated in 1946, and has more than 1000 members who either reside, own property or work in Palm Beach County. FWF and a substantial number of its members frequently engage in recreational, scientific, educational and other related field trips in an around the area where the PROJECT is permitted to be constructed. The ability of FWF and its members to engage in educational, recreational and advocacy activities in this area is injured by the Defendants' failure to comply with the CWA, NEPA, and the APA. The FWF has participated in numerous administrative, State and Federal court proceedings since its formation in 1937 in support of its mission and its members and has submitted numerous comments with respect to this PROJECT at the Mecca Farms site.

REINER & REINER, P.A.
9100 SOUTH DADELAND BLVD., SUITE 1408, MIAMI, FLORIDA 33156

## DEFENDANTS

12.     Defendant U.S. Army Corps of Engineers ("the Corps") is an agency of the federal government which may be named as a defendant and against which a writ in the nature of mandamus, a declaratory judgment and injunctive relief may be entered, pursuant to 28 U.S.C. §§1361, 2201 and 2202, and Fed. R. Civ. P. 57, and 65 (a).   The Corps is the action agency for purposes of environmental review under the NEPA and the CWA.   The Corps finding of no significant impacts ("FONSI") is final agency action for purposes of APA review.   The decision to issue the PERMIT for the PROJECT is final agency action for purposes of APA review.

13.     Defendant Colonel Robert M. Carpenter is the District Engineer, Jacksonville District, U.S. Army Corps of Engineers, and an officer and employee of the United States and its agency, the Department of the Army.   In this capacity, Colonel Carpenter may be named as a defendant and against whom mandamus, a declaratory judgment, and injunctive relief may be entered, pursuant to 28 U.S.C. §§1361, 2201 and 2202, and Fed. R. Civ. P. 57, and 65(a).

## INTRODUCTION

14.     This action seeks to challenge the issuance of a Federal CWA Permit for the dredging and/or filling of jurisdictional waters for a project known as the Scripps Research Institute ("SCRIPPS").   The PROJECT is located western Palm Beach County Florida.   The PROJECT consists of work and/or activities within Waters of the United States that are regulated by the Corps pursuant to Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbor Act of 1899.   This action also challenges the sufficiency and validity of the Corps' Environmental Assessment ("EA"), its finding of no significant impacts and its decision not to prepare, or require the

6

preparation of an Environmental Impact Statement ("EIS") pursuant to the requirements of NEPA and its implementing regulations.

15.     The site of the PROJECT is the Mecca Farms parcel in western Palm Beach County - west of the Loxahatchee Slough and bordering the J.W. Corbett Wildlife Management Area, adjacent to and south of the C-18 canal, all components of the Everglades Ecosystem.  A copy of an aerial map of the property is attached hereto as Exhibit "B."

16.     The site is bordered to the west by the J.W. Corbett Wildlife Management Area;  to the north by publicly owned conservation land (Hungryland Slough), a portion of which serves as a Regional Offsite Mitigation Area or "ROMA"(Unit 11); to the east by undeveloped private land containing extensive wetlands which have been identified as a key area important for restoration; and by the low-density residential development known as the Acreage to the South.  The PROJECT site was historically part of the Hungryland Slough and predominately wetland.  The ditches were constructed in place of historic flowways to drain the site in preparation for agriculture. Thus the ditches are considered Waters of the United States.

17.     The site is within the range of an active woodstork colony.

18.     There is an existing above ground water supply impoundment in the northeastern quadrant of the site that was created as a component of the irrigation system for the agricultural activities.  There is on-going excavation occurring in the southwest quadrant of the site with approximately 40 acres of lake already excavated.

19.     On October 8, 2003, The Scripps Research Institute SCRIPPS based in La Jolla, California, announced plans to open a major East Coast science center in Palm Beach County, Florida

*Florida Wildlife Federation, et al. v. U.S. Army Corps of Engineers*

modeled after its La Jolla campus cluster.

20.     SCRIPPS' La Jolla biotechnology campus cluster includes its own research facilities, other research facilities such as the Salk Institute and the Burnham Institute, and nearly five hundred biotech companies.

21.     Within Palm Beach County, several sites were cursorily assessed to accommodate not only the new SCRIPPS Florida facility, which only requires 100 acres, in and of itself, but to also allow sufficient area for the expected new biotech research centers and related businesses and residential communities that are expected to follow SCRIPPS to this location.

22.     Both the State of Florida and Palm Beach County have provided economic incentive packages to establish the initial Facility. The State of Florida has or will provide $310 million of economic stimulus funds to provide operational funding over a period of seven years, subject to specific performance requirements contained in a Funding Agreement between SCRIPPS and the State.

23.     Palm Beach County has pledged to spend up to $200 million to provide land, and buildings for the new Scripps Florida facility, and more than $140 million to construct infrastructure to serve the project. The County has or will pay $60 million for the 1,919.23 acre Mecca Farms site, with Scripps occupying 102.03 acres. The County will make available the remaining property to other biotech-related companies and support facilities. The Palm Beach County Biotechnology Research Park will replace all of the existing activities on the site.

24.     The Corps is aware of these potential plans to develop the remaining 1,365-acres of the Mecca Farms parcel and the adjacent Vavrus Ranch, as well as to construct several new major

8

*Florida Wildlife Federation, et al. v. U.S. Army Corps of Engineers*

roads or road widenings to access the future proposed development and anticipates applications will

be submitted that propose development on these sites related to the SCRIPPS PROJECT.

## STATUTORY AND REGULATORY FRAMEWORK

## ADMINISTRATIVE PROCEDURES ACT

25.     Pursuant to the Federal Administrative Procedures Act, 15 U.S.C. §702, any person

who has suffered legal wrong because of agency action, or who is adversely affected or aggrieved by

agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

26.     Pursuant to 5 U.S.C. §706, to the extent necessary to decision and when presented,

the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action.     The

reviewing court shall:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) *hold unlawful and set aside agency action, findings, and conclusions found to be:*

>> (A) *arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;*

>> (B) contrary to constitutional right, power, privilege, or immunity;

>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> (D) *without observance of procedure required by law;*

9

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court can review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. (Emphasis added).

27.    An agency's finding of no significant impact and decision not to prepare an Environmental Impact Statement under NEPA is a final administrative decision reviewable under the Administrative Procedure Act. See 5 U.S.C. § 701 et seq.

## **NATIONAL ENVIRONMENTAL POLICY ACT**

28.    The purpose of the National Environmental Policy Act is set forth in 42 U.S.C. § 4331:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, ***particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation***, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and

10

technical assistance, in a manner calculated to foster and promote the general welfare, ***to create and maintain conditions under which man and nature can exist in productive harmony***, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use ***all practicable means***, consistent with other essential considerations of national policy, ***to improve and coordinate Federal plans, functions, programs, and resources*** to the end that the Nation may:

      (1) ***fulfill the responsibilities of each generation as trustee of the environment for succeeding generations***;

      (2) ***assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings***;

      (3) ***attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences***;

      (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

      (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

      (6) ***enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources***.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to

the preservation and enhancement of the environment. (Emphasis added).

29.     Pursuant to 42 U.S.C. § 4342, Congress created the Council on Environmental Quality ("CEQ") for the purpose of promulgating regulations applicable to all federal agencies consistent with the intent and purposes of the Act. Those regulations are set forth in the Federal Code of Regulations at 40 C.F.R. §1500 *et seq.*

30.     Pursuant to the CEQ regulations, Federal agencies are required to assess the impacts of major Federal actions to determine if those actions will significantly affect the human environment. If that environmental assessment ("EA") document results in a finding that an action will likely adversely affect the human environment, a Federal agency is required to prepare and Environmental Impact Statement. The purpose of an EA is to determine whether the agency must prepare and EIS. 40 C.F.R. § 1501.4(b).

31.     In order for the agency to conclude an EIS is unnecessary, it must make a finding that there will be ***no significant impact on the human environment*** from the proposed agency action. 40 C.F.R. §§ 1508.9; 1508.13. The "human environment" is defined "comprehensively to include the natural and physical environment and the relationship of people with that environment." Id. § 1508.14.

32.     NEPA regulations provide guidance on evaluating the significance of an action's impact. Those regulations provide as follows:

> "Significantly" as used in NEPA requires considerations of both context and intensity: (a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests,

12

and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant. (b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1)     Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2)     The degree to which the proposed action affects public health or safety.

(3)     Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4)     The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5)     The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6)     The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7)     Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8)     The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9)     The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10)     Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.   See 40 C.F.R. § 1508.27.

33.     If the agencies' actions are environmentally 'significant' according to any of these criteria, then they erred in failing to prepare an EIS.

34.     Although the Corps' primary function in issuing § 404 permits under the CWA is to protect the integrity of the waters of the United States, 33 U.S.C. § 1251(a), like any other federal agency taking action that could affect the human environment, its NEPA analysis in issuing a § 404 permit **must include consideration of reasonably foreseeable, direct, indirect and cumulative impacts to the "the natural and physical environment"** (40 C.F.R. § 1508.14), not just impacts to wetlands.

35.     Cumulative impacts are impacts on the environment which results from the incremental impact of the action when added to other past, present, and **reasonably foreseeable future actions** regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.   40 C.F.R. § 1508.7.

14

*Florida Wildlife Federation, et al. v. U.S. Army Corps of Engineers*

36.     Regulations implementing NEPA require that an agency consider connected actions and cumulative actions within a single EA or EIS to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.

37.     Neither NEPA nor the Council on Environmental Quality's regulations implementing the procedural provisions of NEPA define agencies' obligations to analyze effects of actions by administrative boundaries. Rather, the entire body of NEPA law directs federal agencies to analyze the effects of proposed actions to the extent they are ***reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur***. Agencies must analyze indirect effects, which are caused by the action, are later in time or farther removed in distance, but are still reasonably foreseeable, ***including growth-inducing effects and related effects on the ecosystem***, as well as the direct, indirect and cumulative effects. Council on Environmental Quality Guidance on NEPA Analyses for Transboundary Impacts, 1 July 1997.

38.     An Environmental Assessment is a concise public document which has three defined functions: (1) It briefly provides sufficient evidence and analysis for determining whether to prepare an EIS; (2) it aids an agency's compliance with NEPA when no EIS is necessary, i.e., it helps to identify better alternatives and mitigation measures; and (3) it facilitates preparation of an EIS when one is necessary. 40 C.F.R. § 1508.9(a).

39.     A Finding of No Significant Impact is a document in which the agency briefly explains the reasons why an action will not have a significant effect on the human environment and, therefore, why an EIS will not be prepared. 40 C.F.R. § 1508.13.

REINER & REINER, P.A.
9100 SOUTH DADELAND BLVD., SUITE 1408, MIAMI, FLORIDA 33156

40.     If an environmental assessment indicates that the environmental effects of a proposal are significant, mitigation measures may be relied upon to make a finding of no significant impact ***only*** if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal.  As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement.  40 C.F.R. § 1508.8, 1508.27.

41.     If there is sufficient public controversy surrounding the potential impacts of a federal agency action the federal agency is required to prepare an EIS.  Controversy sufficient to require preparation of an EIS occurs when substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor ***or there is a substantial dispute about the size, nature, or effect of the major Federal action***.

42.     NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Agencies must consider alternatives in an EA.

43.     The alternatives analysis is central to an environmental analysis.  It should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker ***and the public***. 40 C.F.R. § 1502.14.  An agency must look at every reasonable alternative, with the range dictated by the full ***nature and scope*** of the proposed action.   While the scope may be limited to a specific independent project, the analysis of the nature of the action must include all the effects of the action.

Even if the scope of the project application is limited by genuine independent utility, an alternatives analysis must include an analysis of the full scope of the proposed project and all alternatives.

44.    Pursuant to the statute and regulations the Federal agency undertaking the proposed action shall be considered the lead agency for purposes of NEPA decision-making.

45.    For purposes of the issuance of a Federal Clean Water Act permit to a State or individual applicant, the Corps is the lead or action agency for purposes of NEPA decision-making.

## CLEAN WATER ACT

46.    Under the Clean Water Act, it is illegal for anyone to discharge dredged or fill material into the navigable waters of the Untied States without a permit except under circumstances specifically set forth under the statute and regulations.

47.    The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(2). Dredged or fill materials are pollutants under the CWA. *See* 33 U.S.C. § 1362(6).

48.    Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Corps to issue permits to discharge or place "dredged or fill materials" into waters of the United States, including wetlands, only at specified sites and under prescribed circumstances and conditions.

49.    The Section 404 program places a high priority on the control of activities that are potentially damaging to the Nation's wetlands and other waters. Regulations promulgated by the Environmental Protection Agency pursuant to section 404(b)(1) and a memorandum of understanding between EPA and the Corps further define the Corps' duty in evaluating individual permits under CWA.

17

50.     The 404(b)(1) Guidelines mandate a sequential review process whereby the Corps evaluates individual permits.

51.     First the Corps must evaluate whether an activity is water dependent.  If a proposal is not water dependant, the Corps must presume that an environmentally less damaging practicable alternative exists.  *See* 40 C.F.R. § 230.10(a)(3).

52.     The applicant proposing a project that is not water dependant must show that all available alternatives to the impacts resulting from the discharge of dredged or fill material have been considered, and that no practicable alternative exists which would have less adverse impact on the aquatic environment.  *See* 40 C.F.R. § 230.10(a).

53.     Although a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area.  33 C.F.R. 320.4.

54.     If the permit applicant establishes that no less damaging, practicable alternative is available, the applicant must then show that all appropriate and practicable steps will be taken to minimize adverse impacts of the discharge onto wetlands.  *See* 40 C.F.R. § 230.10(d).

55.     Only after the permit applicant has shown that the avoidance and minimization criteria are satisfied can the Corps even consider mitigation.

56.     In establishing mitigation requirements, the Corps must strive to achieve a goal of no overall net loss of wetland values and functions, meaning a minimum of one-for-one functional replacement with an adequate margin of safety to reflect scientific uncertainty.

REINER & REINER, P.A.
9100 SOUTH DADELAND BLVD., SUITE 1408, MIAMI, FLORIDA 33156

57.    The Corps cannot permit a discharge if the discharge would violate other applicable laws.

58.    The Corps must also ***independently*** determine that the project will not cause or contribute to violations of State water quality standards. *See* 40 C.F.R. § 230.10(b)(1); 40 C.F.R. § 230.10(c). This duty exists independently of any obligation of the State to determine whether a project will cause or contribute to State water quality standards under CWA Section 401.

The Corps must also fully and independently assess each project impact relating to:

(a) water circulation, fluctuation, salinity, and temperature (*see* 40 C.F.R. § 320.11 (b));

(b) the substrate underlying and surrounding the aquatic environment, including the degree and impact of soil compaction (*see* 40 C.F.R. § 320.11(a));

(c) the kinds and concentrations of suspended particulate in the aquatic environment (*see* 40 C.F.R. § 230.11(c));
(d) the degree the fill material will impact the aquatic environment (*see* 40 .F.R. § 230.11 (d));

(e) the degree of impact on the aquatic ecosystem and. organisms (*see* 40 C.F.R. § 230,11(e));

(f) the degree of cumulative effects on the aquatic environment (*see* 40 C.F.R. § 230.11 (g)); and

(g) the degree of secondary effects on the aquatic environment (*see* 40 C.F.R, § 230.11(h)).

59.    Pursuant to 40 C.F.R. § 230.5, the permitting authority for any discharge of dredge or fill material under the statute must, among other things, examine practicable alternatives to the

19

proposed discharge, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences, evaluate the various physical and chemical components which characterize the non-living environment of the candidate sites, the substrate and the water including its dynamic characteristics, identify and evaluate any special or critical characteristics of the candidate disposal site, and surrounding areas which might be affected by use of such site, related to their living communities or human uses, evaluate the material to be discharged to determine the possibility of chemical contamination, identify appropriate and practicable changes to the project plan to minimize the environmental impact of the discharge and impose zero net loss mitigation within the action area.

60.     The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the ***public interest***. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.

## FACTS COMMON TO ALL COUNTS

61.     Mecca Farms is located in the watershed of a designated National Wild and Scenic River, the Northwest Fork of the Loxahatchee River. It is bounded on three sides by sites containing a significant number of acres of high value, natural wetlands.

62.     Two of these sites, J.W. Corbett Wildlife Management Park and the Hungryland Slough are in public ownership. A portion of the Hungryland Slough known as Unit 11 is also

20

designated at Regional Offsite Mitigation Area pursuant to Florida Law.

63.     According to the public notice, the 535 acre PROJECT site contains 486.1 acre of uplands, 27.6 acres of active sand quarry, and 213 acres of jurisdictional ditches. The ditches, which are permanently inundated, drain and irrigate the surrounding orange groves. They flow into a Mecca Farms reservoir, which discharges into the west branch of the C-18 Canal, a tributary of the Northwest Fork of the Loxahatchee River.

64.     The ditches contain narrow bands of littoral vegetation including cattail, water pennywort, primrose willow, and coontail. Vegetation in the quarry has been identified as including cattail, torpedo grass, maidencane, and water pennywort.

65.     In July 1999, the EPA Regional Administrator, the US Army Corps of Engineers' District Engineer, and the Treasure Coast Regional Planning Council Executive Director signed the Loxahatchee River Basin Wetland Planning Project for Palm Beach County.

66.     This document identified several issues of relevance to the current Scripps development proposal:

    a.  The Mecca Farms and Vavrus Ranch sites are strategically located in the Loxahatchee River Basin;

    b.  The Mecca Farm's site was historically underlain by Riviera sand hydric soils and the Vavrus Ranch site still contains significant, high value wetland;

    c.  The Loxahatchee River suffers from reduced hydrologic flows, because connections from certain wetland systems have been diverted from the drainage basin;

    d.  The river could benefit from increased water storage in the watershed and Mecca Farms was identified as a potential site for a water storage reservoir which could release water to the Northwest Fork of the Loxahatchee River during the dry season or periods of drought; and

    e.  Vavrus Ranch was identified as a site with significant wetlands in need of protection.

67.    The County is proposing to construct a 183 acre research institute, a 30 acre town center with commercial and multi-family residential housing, a 27 acre clinic/hospital, a 15 acre utility site, and three surface water management lakes totaling 87 acres.

68.    This development would directly impact 212 acres of jurisdictional drainage ditches. Fill would be placed over 20.1 acres of ditches and dredging would occur in 32 acres of ditches.

69.    Palm Beach County intends to develop the remaining Mecca Farms parcel.  On or about May 10, 2004, Palm Beach County submitted an application for a Development of Regional Impact pursuant to Section 380.06 and 403.973, Florida Statutes, entitled Palm Beach County Biotechnology Research Park ("PBCBRP").

70.    On or about October 13, 2004, the Palm Beach County Commission  approved six amendments to its comprehensive land use plan, approved development orders for a Development of Regional Impact for the PROJECT, rezoned the Mecca Farms property and a portion of the Corbett Wildlife Refuge, and approved changes to its Unified Land Development Code to authorize the development.

71.    The County intends to locate electricity infrastructure for the development within the J.W. Corbett Wildlife Refuge and has already publicly announced plans to locate schools and other residential services as a part of the development on the Vavrus Ranch property.

72.    Palm Beach County is acting as the master developer for the PBCBRP, which will feature the Scripps Research Institute as the centerpiece of the development.  The site is planned as

REINER & REINER, P.A.
9100 SOUTH DADELAND BLVD., SUITE 1408, MIAMI, FLORIDA 33156

the East Coast science center for SCRIPPS. Plans for the development include agreements for high density development on all or part of the Vavrus Ranch property.

73.    The Mecca Farms site was selected as the proposed location for this project based on its proximity to the adjacent Vavrus Ranch site. Agreements for sale and purchase of the adjacent Vavrus Ranch site have been executed, and development plans are proceeding for the Gardens Scientific and Technology Community ("GSTC") on 2000 acres of Vavrus Ranch. The GSTC consists of 2 million square feet of research / office space, 350,000 square feet of retail space and 7,500 residential units. Developers have also acquired an option to purchase the remaining 2500 acres of the Vavrus Ranch which is likely to develop at similar densities and intensities as the Mecca parcel. The County has engaged in joint planning efforts to develop the Vavrus property with complementary uses to the proposed Research Park. The development of the Gardens DRI is a direct result of the County's decision to site the Scripps Biotech Park on Mecca Farms. The development of the Vavrus Ranch with the proposed uses is unlikely to occur if the research and development uses proposed on the Mecca Farms site are not approved. The GSTC application submitted for the Vavrus property shows a master plan which is clearly intended to be integrated with the master plan for the subject site.

74.    The Mecca development alone is planned to include at least the entire 1919.23 acre site currently occupied by Mecca Farms. The site plan includes a variety of land uses related to science and technology, biotechnology, biomedical research, development, and manufacturing industries. In addition, the SCRIPPS research park will include a satellite university campus, institutional uses, residential, commercial, hotel, hospital, and community facilities such as parks,

recreation, utilities, and other public services.

75.   These land uses have been organized into four major districts, including the SCRIPPS District, a Town Center District, a Research and Development District, and a Neighborhood Center District.

76.   The SCRIPPS District consists of 102.03 acres of land with approximately 2,000,000 S.F. of building space. This district is located in the southern portion of the development site.

77.   A 364,000 S.F. biomedical research facility is planned for the first phase of development in this district. Planning, development, and construction for the first phase have already begun and are well underway.

78.   This Research and Development District consists of about 514 acres with approximately 8,500,000 SF of building space. This district is located in the central portion of the PROJECT site and to the east of the SCRIPPS District. It is reserved for the development of other biotechnology related companies and support facilities that will be encouraged to locate near SCRIPPS.

79.   The Town Center District consists of about 50 acres with approximately 430,000 SF of building space. This district is located immediately west of the SCRIPPS District. It will serve the residents and employees of the development. The Town Center District will include commercial, retail, office, residential, and a variety of other uses.

80.   The Neighborhood Center District consists of about 134 acres and includes the majority of the 2000 or more residential units included in the development design. This district is located in the northern portion of the development. It is intended to provide housing for employees

24

who live and work on the development site. Similar to the Town Center District, the Neighborhood Center District will include commercial, retail, office, residential, and a variety of other uses.

81.     The development also intends to include an educational/institutional component that will include a magnet high school for approximately 2,500 students and a satellite university campus for 2,000 full time students. These facilities are planned to occupy 103 acres. The northwest corner of the Neighborhood Center District has been proposed as a location for the high school. The southern portion of the site near the SCRIPPS District and Town Center District has been proposed as a location for the college campus.

82.     The County has maintained publicly on numerous occasions that the entirety of the PROJECT, including its research hospital, university, and thousands of homes are absolutely necessary in order to achieve the massive biotech economic cluster the project is intended to provide.

83.     The County has further publicly stated that the sole reason that they submitted the application to the Corps for less than the full extent of the proposed development was because that was the only way that the permit's issuance could be expedited, which demonstrates an intent to intentionally restrict the Corps' review to less than the full range of impacts expected to be associated with the proposed development.

84.     The proposed development will include a number of community facilities, including, electric utilities to be operated by Florida Power and Light Company, and a Fire-Rescue Station and includes the extension of water and sewer lines by the Palm Beach County Water Utilities Department.

85.     The public notice states that no offsite roadway improvements are necessary for the

PROJECT, however, the construction of new segments of Seminole Pratt Whitney Road and PGA Boulevard, as well as the widening of several segments of those roads as well as Northlake Boulevard and Indiantown Road are necessary requirements under State law in order to site the PROJECT on the Mecca Property, and have been planned as part of a series of comprehensive plan amendments adopted by Palm Beach County. The PROJECT would fail to meet State traffic concurrency requirements under Chapter 163, Florida Statutes if these roadway improvements were not constructed. The extension and expansion of these roadways will significantly impact wetlands. These roadway extensions and expansions have been publicly discussed on numerous occasions and have been placed on Palm Beach County's Transportation Improvements map as well as the County's Five Year Road Program and other planning documents for planning, funding and construction in the next five years.

86. A traffic study prepared by Pinder Troutman Consulting, Inc., West Palm Beach, Florida indicates that the entire development will likely increase traffic on the affected arterial roadways more than fifty fold.

87. Palm Beach County's North County Airport is near the site of the proposed development. It is probable that the type and frequency of aircraft activity at this airport will change and increase as a result of the proposed development.

88. In order to develop the biotech park, State-owned conservation land at the J.W. Corbett Wildlife Management Area must be converted to an "accessory multi-use site" to allow roadway and canal construction for the Biotech Park.

89. The Mecca Farms parcel has been identified as a potential site for a stormwater

treatment area or reservoir for restoration of the Loxahatchee River pursuant to the Comprehensive Everglades Restoration Plan.   Development of the entirety of the Biotech Park on the Mecca Farms site would preclude these uses.

90.     Significant offsite impacts are inevitable when the density and intensity of the proposed project is considered in conjunction with its proposed location in the immediate vicinity of tens of thousands of acres of conservation and low density rural lands in the headwaters of the federally designated wild and scenic river.

91.     Among the impacts expected from the entire project are:

    a.   Reduced ability to fire-manage the habitat within the JW Corbett Wildlife Management Area and Hungryland Slough;

    b.   Adverse impacts from exotic pest and plants from the urban development to be placed adjacent and nearby to Corbett, Hungryland and the Loxahatchee Slough;

    c.   Wildlife mortality from road-kill associated with the new and widened roads to serve the development;

    d.   Bisection and fragmentation of habitat in the Hungryland Slough, Loxahatchee Slough and wetlands on the Vavrus parcel from the roads to be built or widened for the project;

    e.   Noise and light pollution from the development;

    f.   Cumulative impacts from similar development on the Vavrus parcel and others in the vicinity that would reasonably be expected based on the approval of the instant project; and

    g.   Decreased ability to achieve restoration of the Loxahatchee River.

# COUNT I

# IMPROPER AGENCY ACTION
## VIOLATIONS OF NEPA

27

Plaintiffs reallege and reaver the allegations in paragraphs 1-91 as though fully set forth herein.

92.    In 2003, Palm Beach County made application to the Defendant Corps for a dredge and fill permit under the Federal Clean Water Act, 33 U.S.C. §1344 *et seq.* and the Rivers And Harbors Act of 1899, 33 U.S.C. §403, for the initial phase of the planned development.

93.    Issuance of a dredge and fill permit constitutes major federal action for purposes of the **National Environmental Policy Act**, ("NEPA") 42 U.S.C. §4321, *et seq.*

94.    On or about February 22, 2005, the Defendant Corps issued Permit No.: SAJ 2004-2859 (IP-AAZ) for the PROJECT and limited their impacts evaluation under the NEPA to only a small 535 acre portion of the proposed 1900 acre development despite the fact that the Corps was aware that future development and construction activities are planned to occur in the area if the PERMIT is issued.  The Corps' PERMIT contained a NEPA finding of no significant impacts ("FONSI") for the small 535 acre portion of the proposed 1900 acre development.  Based on the following, that finding is in violation of NEPA, is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with federal law.

95.    The Defendant Corps issued Permit No.: SAJ 2004-2859 (IP-AAZ) and FONSI for the PROJECT limiting their impacts evaluation under the NEPA to only a small 535 acre portion of the proposed 1900 acre development yet expanding their benefits analysis to the entire development in violation of NEPA.

96.    The Defendant Corps issued Permit No.: SAJ 2004-2859 (IP-AAZ) and FONSI for

REINER & REINER, P.A.
9100 SOUTH DADELAND BLVD., SUITE 1408, MIAMI, FLORIDA 33156

the PROJECT limiting their impacts evaluation under the NEPA to only a small 535 acre portion of the proposed 1900 acre development despite the fact that the Corps was aware that the applicant intends to develop the remaining acreage on the Mecca Farms parcel; despite the fact that the developers intend to develop the adjacent property known as the Vavrus Ranch; despite the fact that the Department of Transportation, or the County intends to construct new roads to access the future additional proposed development; and despite the fact that Florida Power and Light intends to construct new power substations - all in violation of NEPA.

97.     The Corps issued the PERMIT and FONSI for the 535 acre initial phase of the development based on the improper finding that the initial phase biotechnology research park has "independent utility" from any other future development.  As a direct result of this improper "independent utility" classification the Corps failed to undertake the otherwise required expanded NEPA scope of impacts analysis in violation of NEPA.

98.     On or about August 10, 2004, in the case of <u>O'Reilly v. U.S. Army Corps of Engineers</u>, 2004 U.S. Dist. LEXIS 15787, 2004 WL 1794531, (E.D. La. 2004) the Corps, in a very similar case involving phased development and a determination of "independent utility," was found to have violated NEPA by not thoroughly analyzing the entire scope of environmental impacts under NEPA: "The Corps acted arbitrarily, capriciously, or abused its discretion by issuing the § 404 permit without preparing a full EIS as required by NEPA.  In light of the long-term and irreversible environmental impacts associated with this project, the Corp's action is wholly at odds with NEPA." <u>Id</u>.  A copy of that decision is attached hereto as Exhibit "C."

99.     In light of the <u>O'Reilly</u> decision only six months earlier, the Corps' decision to issue

Permit No.: SAJ 2004-2859 (IP-AAZ) and the FONSI for the PROJECT and limit the scope of their impacts evaluation under the NEPA to only a small 535 acre portion of the entire development is clearly unreasonable, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with federal law and in violation of NEPA.

100.   As a result of the Corps' decision to issue Permit No.: SAJ 2004-2859 (IP-AAZ) and the FONSI for the PROJECT and limit the scope of their evaluation under the NEPA to only a small 535 acre portion of the entire development, the Corps fails to adequately identify secondary impacts of either the permitted PROJECT or the entire development - in violation of NEPA.

101.   As a result of the Corps' decision to issue Permit No.: SAJ 2004-2859 (IP-AAZ) and the FONSI for the PROJECT and limit the scope of their evaluation under the NEPA to only a small 535 acre portion of the entire development, the Corps fails to adequately identify and properly evaluate alternatives for either the permitted PROJECT or the entire development - in violation of NEPA.

102.   As a result of the Corps' decision to issue Permit No.: SAJ 2004-2859 (IP-AAZ) and the FONSI for the PROJECT and limit the scope of their evaluation under the NEPA to only a small 535 acre portion of the entire development, the Corps fails to adequately identify the degree of mitigation necessary to off-set the direct, indirect, cumulative and secondary impacts of either the PROJECT or the entire development - in violation of NEPA.

103.   As a result of the Corps' decision to issue Permit No.: SAJ 2004-2859 (IP-AAZ) and the FONSI for the PROJECT and limit the scope of their evaluation under the NEPA to only a small 535 acre portion of the entire development, the Corps fails to adequately evaluate the direct, indirect,

cumulative and secondary harm to threatened and endangered species and habitat for either the permitted PROJECT or the entire development - in violation of NEPA.

104.    As a result of the Corps' decision to issue Permit No.: SAJ 2004-2859 (IP-AAZ) and the FONSI for the PROJECT and limit the scope of their evaluation under the NEPA to only a small 535 acre portion of the entire development, the Corps failed to reasonably acknowledge or factor into their analysis, the impacts of the entire five-phase, 2000 acre, 2000 + home, 8.5 million square foot industrial, and one-half million square foot retail Palm Beach County Biotechnology Research Park Development of Regional Impact application and enabling comprehensive zoning and land management law changes made by the applicant, prior to the issuance of the FONSI, and in furtherance of the entire development - in violation of NEPA.

105.    The Corps' Memorandum for Record and the FONSI for the PROJECT fail to make an independent analysis of the water quality certification issues - in violation of NEPA.

106.    As a result of the Corps' decision to issue Permit No.: SAJ 2004-2859 (IP-AAZ) for the PROJECT and limit the scope of their evaluation under the NEPA to only a small 535 acre portion of the entire development, the Corps fails to acknowledge or factor into their analysis the significant public outcry and controversy (including ongoing legal challenges) surrounding the potential impacts of the PROJECT or the entire development and the substantial question and uncertainty regarding the impact of either the permitted PROJECT or the entire development - which controversy triggers the need for an EIS - in violation of NEPA.

**WHEREFORE**, Plaintiffs respectfully requests this Court to issue an order:

A.    Declaring the Corps' issuance of Permit No.: SAJ 2004-2859 (IP-AAZ) and FONSI violate NEPA;

B.    Declaring that the Defendants' EA and FONSI insufficient and its issuance arbitrary and capricious and in violation of NEPA;

C.    Declaring that Permit No.: SAJ 2004-2859 (IP-AAZ), based on its failed NEPA analysis is invalid;

D.    Preliminarily and permanently enjoining the Defendants from allowing the permittee to take any action which in any way supports or furthers construction or development of the PROJECT based on Permit No.: SAJ 2004-2859 (IP-AAZ) until the Defendants have remedied their violations of NEPA;

E.    Requiring the Defendants to adequately and fully analyze all impacts and reasonable alternatives to the entire proposed development project as required by NEPA and its implementing regulations;

F.    Requiring the Defendants to prepare an EIS inclusive of all reasonably foreseeable impacts of the entire probable development (the entire scope of the proposed development), including all cumulative impacts as required by NEPA and its implementing regulations;

G.    Awarding Plaintiffs their reasonable attorneys fees, costs and expenses pursuant to 28 U.S.C. §2412, the Equal Access to Justice Act and Rule 54(d), Fed.R.Civ.P.;

H.    And granting such other and further relief as the Court may deem just and proper.

# COUNT II

## IMPROPER AGENCY ACTION
## VIOLATIONS OF CWA - USACOE

Plaintiffs reallege and reaver the allegations in paragraphs 1-106 as though fully set forth herein.

107.    Based on the request of the permit applicant, and the Corps' ultimate decision to

32

review and evaluate the proposed PROJECT in isolation as having independent utility, the Corps on

February 22, 2005, published a memorandum of record and FONSI approving Permit No.: SAJ 2004-

2859 (IP-AAZ) for the PROJECT and limited their evaluation under the NEPA to only a small 535

acre portion of the entire development. The Corps took this action despite the decision in O'Reilly v.

U.S. Army Corps of Engineers, 2004 U.S. Dist. LEXIS 15787, 2004 WL 1794531, (E.D. La. 2004)

only six months prior which overturned a substantially similar decision.

108. On or about August 13, 2004, the United States Environmental Protection Agency

("EPA"), in a letter to the Corps commenting on the PERMIT application, expressed concerns that

the development may not comply with the Section 404(b)(1) Guidelines, the implementing regulations

for Section 404 of the Clean Water Act, which require a sequential analysis of avoidance,

minimization, compensatory mitigation and avoidable and/or significant adverse impacts to the

aquatic environment.

109. The EPA concluded that they believed that less environmentally damaging alternatives

may exist for this PROJECT which were not analyzed. Despite the EPA's concerns about the scope

of the Corps analysis for PERMIT, the Corps, on February 22, 2005, issued the FONSI and the

PERMIT for the small 535 acre portion of the entire development without properly analyzing the

significant adverse environmental impacts of the entire proposed development in violation of the

CWA. A copy of that letter is attached hereto as Exhibit "D."

110. A cumulative and secondary impacts analysis is required under applicable CWA law

and regulations because the total impacts of all related projects in an action area, when combined,

may be greater than the individual local impacts of the discrete parts. The Corps' failure to require

the applicant to include or consider the total cumulative and secondary impacts of the entire

development is a violation of the CWA.

111.    The Corps' failure to require the applicant to include or consider less damaging alternatives is a violation of the CWA.

112.    The Corps decisions not to adequately and independently assess the impacts of the entire scope of the development negates its findings in the Memorandum for Record and the FONSI determination and cannot form the basis for the lawful issuance of a permit under the CWA.

**WHEREFORE**, Plaintiffs respectfully requests the following:

A.    Declare the Defendants' February 22, 2005 Memorandum of Decision was arbitrary and capricious, unsupportable, contrary to law and in violation of the CWA;

B.    Declare that the Defendants' decision not to analyze the adverse environmental impact of the entire probable development or require the applicant to prepare an EIS as a part of applying for a 404 permit was arbitrary and capricious, unsupportable, contrary to law and in violation of the CWA;

C.    Declare that Permit No.: SAJ 2004-2859 (IP-AAZ) issued pursuant to the illegal Memorandum of Decision and illegal FONSI for the PROJECT are invalid;

D.    Preliminarily and permanently enjoin the Defendants from taking any action on any new permit application for this PROJECT until they have analyzed the entire proposed development pursuant to NEPA;

E.    An Order awarding Plaintiffs their reasonable attorneys fees, costs and expenses pursuant to 28 U.S.C. §2412, the Equal Access to Justice Act and Rule 54(d), Fed.R.Civ.P.;

F.    Such other and further relief as the Court may deem just and proper.

**DATED** this **20** day of April, 2005

REINER & REINER, P.A.
9100 SOUTH DADELAND BLVD., SUITE 1408, MIAMI, FLORIDA 33156

*Florida Wildlife Federation, et al. v. U.S. Army Corps of Engineers*

Respectfully Submitted,

**ENVIRONMENTAL & LAND USE
LAW CENTER, INC.**
**RICHARD J. GROSSO, ESQ.,**   Florida Bar No. 0592978
*Co-Counsel for Plaintiffs*
Shepard Broad Law Center
3305 College Avenue
Ft. Lauderdale, FL 33314
Phone: (954) 262-6140; Facsimile: (954) 262-3992
e-mail:  *grossor@nsu.law.nova.edu*

**LISA B. INTERLANDI, ESQ.,** Florida Bar No. 0146048
330 U.S. Highway 1, Suite 3
Lake Park, Florida 33403
Phone: (561) 844-5222; Facsimile (561) 844-5004
e-mail:  *lisa@elulc.org*

**ROBERT N. HARTSELL, ESQ.,** Florida Bar No. 0636207
330 U.S. Highway 1, Suite 3
Lake Park, Florida 33403
Phone: (561) 844-5222; Facsimile (561) 844-5004
e-mail:  *robert@elulc.org*

**RUMBERGER, KIRK & CALDWELL**
*Co-Counsel for Plaintiffs*
**EDWIN THOM RUMBERGER, ESQ.,** Florida Bar No. 69480
108 South Monroe Street
Tallahassee, FL 32301
Phone: (850) 222-6550; Facsimile: (850) 222-8783
e-mail:  *trumberger@rumberger.com*

**REINER & REINER, P.A.**
*Co-Counsel for Plaintiffs*
9100 South Dadeland Boulevard, Suite 1408
Miami, Florida  33156-7816
Phone: (305) 670-8282; Facsimile: (305) 670-8989
e-mail:  *dpr@reinerslaw.com*

By: _____
   **DAVID P. REINER, II, ESQ.;** Florida Bar No. 416400

35

*EXHIBIT "A"*

22 February 2005

CESAJ-RD-SS
SAJ-2004-2859(IP-AAZ)

MEMORANDUM FOR RECORD

SUBJECT:  Department of the Army Environmental Assessment and
Statement of Finding for Above-Numbered Permit Application

Applicant:      Palm Beach County
                Attn: Ms. Audrey Wolf
                3323 Belvedere Road
                West Palm Beach, FL 33406

2.  Location, Existing Site Conditions, Project Description,
Changes to Project:

     a.  Location:  The project, known as the Scripps Research
Institute (SCRIPPS) in Palm Beach County, is located in waters
of the United States on an active orange grove in the northeast
corner of the intersection of Seminole Pratt Whitney Road and
100th Lane North in Sections 7 and 8, Township 42S, Range 41E,
Palm Beach County, Florida.

     b.  Existing Site Conditions:  The biotechnology research
park would be constructed on approximately 535 acres of a 1,900-
acre site (referred to as Mecca Farms), which currently is being
utilized as an active orange grove with a 27.6-acre active sand
mine operation on a portion of the site.  The surface water
management system consists of perimeter canals and berms,
primary water drainage canals, and groves with a series of
parallel drainage ditches spaced at 360-foot intervals.  Of the
535 acres, approximately 486.1 acres are uplands, 27.6 acres are
an active sand quarry pit (which is not jurisdictional since it
is active), and 21.3 acres are jurisdictional drainage ditches.
The primary canals and ditches are considered to be
jurisdictional waters of the United States.  The drainage
ditches are permanently inundated and drain/irrigate the
surrounding orange groves.  Vegetation is present in the ditches
in a narrow littoral edge, including a mixture of mainly exotic
and nuisance species of cattail (*Typha* spp.), water pennywort
(*Hydrocotyle* spp.), primrose willow (*Ludwigia peruviana*), and
coontail (*Ceratophyllum demersum*).  Vegetation in the quarry is
very sparse and limited to a few patchy areas, which includes

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

cattail, torpedo grass (*Panicum repens*), maidencane (*Panicum hemitomon*), and water pennywort.  The site is bordered by active orange groves and undeveloped public land (Unit 11 Hungryland Slough) to the north; undeveloped private land to the east; an active orange grove, Northlake Road, and residential development to the south; and Seminole-Pratt Whitney Road (unimproved) and J.W. Corbett Wildlife Management Park to the west.  The project site was historically part of the Hungryland Slough and predominately wetland.  The ditches were constructed in place of historic flowways to drain the site in preparation for agriculture.  Thus the ditches are considered Waters of the United States.

    c.  Project Description:  This applicant proposes to construct a biotechnology research park with supporting amenities on 535 acres.  The development includes the construction of the Scripps Research Institute on 183 acres of land, a 30-acre town center with commercial and multi-family residential housing, a 27-acre clinic/hospital, a 15-acre utility site, three surface water management lakes (87 acres in total), 3 acres of internal roads, 97 acres of upland hardwood forests, and 93 acres of open space.  As a result of the project, approximately 21.3 acres of jurisdictional drainage ditches would be impacted.  The applicant would place approximately 293,900 cubic yards of fill over 20.1 acres of ditches, and dredge approximately 39,950 cubic yards from 1.2 acres of ditches for the creation of surface water management lakes.  The existing open water quarry will be expanded from its current size of 27.6 acres to 48 acres. Including the quarry expansion, approximately 59.7 acres of surface water management lakes are proposed.

    d.  Changes to Project:  The original application included a proposal to develop approximately 414 acres, but was revised to include a total of 535 acres.  The increase in acreage is a result of a surface water management pond expansion.  This modification was needed to account for project fill requirements based on the site plan and is expected to complete the project without the need of off-site fill sources.  Other changes were the

-2-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

result of the U.S. Army Corps of Engineers (Corps) requesting the
applicant provide a native, upland buffer along the eastern
portion of the site to offset any adverse impacts to the off-site
wetlands as a result of encroaching development.

3.  Project Purpose:

    a.  Basic:  The basic purpose of this project is commercial
development.

    b.  Overall:  The overall purpose of this project is to
construct a biotechnology research park with its core supporting
amenities, which includes a clinic/hospital, some additional
commercial space, and some residential development in Palm Beach
County, Florida.

4.  Scope of Analysis:  The Corps' jurisdiction includes the
proposed project site and the surrounding areas where
construction equipment will be staged/located.  The proposed
project site does not exhibit any unique or rare characteristics
since the site is an active orange grove and sand mine.
Historically, the project site was part of the Hungryland Slough
and predominately wetland, as seen in the soils maps.  The
ditches were constructed in place of historic flowways to drain
the site in preparation for agriculture.  Thus, the ditches are
considered Waters of the United States.

The Corps is aware that future development and construction
activities may occur in the area if this permit is issued, such
as the Palm Beach County may develop the remaining 1365-acre
Mecca Farms parcel, the Town of Palm Beach Gardens may develop
the adjacent property known as the Vavrus Ranch, the Department
of Transportation, or the County may construct new roads to
access the future additional proposed development, and Florida
Power and Light may construct new power substations.  The Palm
Beach County has requested that the Corps evaluate the proposal
to construct a 535-acre biotechnology research park
independently from the remaining future development on the

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

1,900-acre site, as well as any future planned development in
the nearby area because the biotechnology research park has
independent utility from any future development.  The Corps'
definition of independent utility is "a test to determine what
constitutes a single and complete project.  A project is
considered to have independent utility if it would be
constructed absent the construction of the other related
projects in the general area.  Portions of a multi-phase project
that depend upon other phases of the project do not have
independent utility.  Phases of a project that would be
constructed even if the other phases were not built can be
considered as separate single and complete projects with
independent utility." 67 Fed. Reg. 2094 (January 15, 2002).  The
Corps believes that the Palm Beach County has shown that the
535-acre biotechnology research park development has independent
utility from the remaining future development on the 1,919-acre
Mecca Farms site, from the development on the Vavrus Ranch, and
the construction of the future roads because the biotechnology
research park could be constructed alone, without the need for
the remaining development, and is not dependent on that other
development for its success.  In addition, no new roads would be
constructed outside of the 535-acre site as a result the
biotechnology research park.  Any new roads would be constructed
related to the other development that may or may not occur.
Moreover, the development of Vavrus Ranch and the remainder of
Mecca Farms are likely even if the SCRIPPS Biotechnology Park is
not built.  Mecca Farms is essentially upland with drainage
ditches and has existing road access, thus would be a preferred
site for development under the Corps regulations to other sites
that would generally have some wetlands.  Vavrus Ranch has
substantial areas of upland and degraded wetlands and would
clearly be developable under the Corps regulations.  The SCRIPPS
portion of the development would only need to improve an
existing portion of a road, Seminole-Pratt Whitney.  Therefore,
the Corps has reviewed the application for the 535-acre
development independently from the remaining future planned
development.  This application approval does not in anyway imply
approval of yet to be submitted applications on adjoining
properties.  The remaining development and any proposed future

-4-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

road construction/expansion will be evaluated and processed by
the Corps under a separate application number once it is
submitted.

5.  Statutory Authority: Section 404 of the Clean Water Act of
1972, as amended.

6.  Other Federal, State, and Local Authorizations Obtained or
Required and Pending:

    a.  State water quality certification (WQC): The South
Florida Water Management District (SFWMD) issued a conceptual
permit #50-06558-P on 10 December 2004.

    b.  Coastal Zone Management (CZM) consistency/permit:  There
is no evidence or indication from the State of Florida that the
project is inconsistent with the Florida CZM.  Issuance of a
SFWMD permit certifies that the project is consistent with the
Florida CZM plan.

    c.  Other authorizations:  The Corps is not aware of any
other permits issued for this project.

7.  Date of Public Notice and Summary of Comments:

    a.  Pre-application meeting(s):  The Corps attended the pre-
application meeting, which was held on 10 March 2004, for all
interested agencies and parties.

    b.  Important dates:  The Corps received the application on
13 May 2004, and conducted a jurisdictional determination on 7
June 2004.  The Corps received a modification to the application
on 9 June 2004, which included an increase in the acreage amount
of a surface water management pond.  The Corps requested
additional information necessary to complete a public notice for
an individual permit on 14 June 2004.  The applicant responded
with additional information on 9 July 2004, and the Corps
considered the application complete.  The Corps completed the
public notice on 27 July 2004, which was published on the web on 4

-5-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

August 2004. Because the site is within the range of an active
woodstork colony and the mitigation will be performed within the
same core foraging area for the woodstork, the Corps made a
determination that the proposed work may affect, but is not likely
to adversely affect the woodstork. The public notice was sent to
all interested parties including appropriate State and Federal
agencies.

    c. Public notice comments: Since two major hurricanes
affected the South Florida area during the time the public
notice closed, the Corps extended the public comment time frame
from 4 September 2004 to 4 October 2004. The Corps has reviewed
all of the comments submitted in response to the circulation of
the public notice. The Corps has summarized these comments
below:

        (1) U.S. Environmental Protection Agency (EPA): The
EPA responded to the public notice on 13 August 2004. The EPA
raised concerns with the alternative sites analysis, water
storage and conveyance to the North Fork of the Loxahatchee
River, prior converted wetlands, appropriate mitigation, water
quality issues, the ecological benefit of the project, secondary
and cumulative effects, and the development of adjacent
properties.

        (2) U.S. Fish and Wildlife Service (FWS): The FWS
requested via email on 20 August 2004, that the Corps include a
determination for the eastern indigo snake. The Corps sent a
determination on 23 August 2004, via email, that the project may
affect but is not likely to adversely affect the eastern indigo
snake with adherence to the eastern indigo snake construction
precautions. The FWS responded to the public notice on 22
September 2004. The FWS concurred with the Corps' determination
that the project may affect but is not likely to adversely
affect the eastern indigo snake and the woodstork. The FWS has
no objections to the issuance of the permit, but recommended
that the Corps coordinate overall project planning with the
Everglades Restoration Program and ensure a "no net loss"
wetland policy.

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

(3)  National Marine Fisheries Service (NMFS):  The
NMFS, Habitat Conservation Division responded to the public
notice on 10 September 2004.  The NMFS is concerned with
secondary and cumulative effects, further development of
adjacent properties, avoidance and minimization, appropriate
mitigation, prior converted wetlands, and evaluation of direct
and indirect impacts as a result of the project.

(4)  State Historic Preservation Officer (SHPO):  The
SHPO responded to the public notice on 15 October 2004.  The
SHPO had no concerns with the project.

(5)  State and local agencies:  The Corps has not
received any comments from state or local agencies.

(6)  Organizations:  Several organizations and
interested parties responded to the public notice.  Many
requested that a public meeting or a public hearing be held for
this project.  Many concerned parties also believed that the
project warranted an Environmental Impact Statement (EIS).
Other concerns that were raised included cumulative impacts,
endangered species, historic resources, water quality, water
storage, Comprehensive Everglades Restoration Program (CERP),
mitigation, alternative sites analysis, single and complete
project, independent utility, cost to the taxpayers, development
on adjacent properties, impacts to conservation lands, rate of
development in Palm Beach County, secondary and cumulative
impacts, watershed analysis, water resources, water supply,
water storage, and compliance with the Palm Beach County's
Comprehensive Plan with Urban Development.

(7)  Individuals:  The issues that were raised by
members of the public included requests for a public hearing or
a public meeting, requests that the applicant perform an EIS,
secondary impacts, cumulative impacts, direct impacts, water
quality concerns, questions whether the project has independent
utility, wildlife impacts, contradiction to the CERP goals,
impacts to environmentally sensitive lands, water recharge,

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

urban development, cost of the project, political influences
driving the decisions, impacts to the Wild and Scenic River, the
loss of agricultural lands, terrorism, soil testing on the MECCA
property, and the fast-track approach.

        (8)  Others Including Internal Coordination:  We have
received no negative comments resulting from internal
coordination.  The Corps has received comments from the
Comprehensive Everglades Restoration Plan (CERP)
representatives.  The CERP acknowledged that a portion of the
Mecca Farms parcel is a potential site to be either a stormwater
treatment area or a reservoir within the CERP North Palm Beach
County PIR.  However, since the Palm Beach County agreed to set
aside a flow way area that would transfer the water to the C-18
Canal, the CERP believes that the potential management measure
(the "flow way") may allow a vital hydraulic conveyance to the
Northwest Fork of the Loxahatchee River.  Overall, the CERP
program is in support of the flow way serving as a potential
management measure to move water through the site because it
would benefit the CERP goal.  Since the SCRIPPS development
would not interfere with the storage capacity of the above-
ground reservoir in the northeast portion of the site, nor would
it interfere with the potential for the flow way to exist, the
Corps believes that this project would not be contrary to the
CERP program or goals.

    d.  Response to the comments:  A copy of the letters
received in response to the public notice was provided to the
applicant upon close of the comment period.  The Corps
informally sent the applicant a copy of the comments on 1
October 2004 and formally sent a copy of the comments and a
request for additional information by letter dated 2 November
2004.  The applicant responded to the federal agencies' letters
on 12 October 2004 and to the Corps' formal request for
additional information on 30 November 2004.  The Corps was
satisfied with the responses provided by the applicant.  The
Corps has evaluated the public comments and the applicant's
responses below.

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

        (1)  In response to the EPA comments, the Corps has
addressed their alternative sites analysis concerns in Section
8.  The concerns with the water storage and conveyance to the
North Fork of the Loxahatchee River have been satisfied by the
coordination and input by the CERP.  Since the Natural Resource
Conservation Service has not conducted a jurisdictional
determination on the property, the site has not been determined
to be prior converted croplands (PCs).  In general, for PCs in
southeast Florida that are proposed for commercial, residential,
or institutional development, the Corps is taking a consistent
approach by first evaluating the PC areas to determine if they
meet any of the criteria in the 87 Manual, under either Section
D. (Routine Determinations) or Section F. (Atypical Situations).
If we determine these areas are wetlands, then we evaluate any
proposal for fill as we routinely would evaluate any wetland
area.  In addition, on PC land in southeast Florida, we are also
receiving mitigation for unavoidable impacts to the agricultural
ditches and stormwater ponds excavated in former wetlands.  Upon
examination, the PC areas on the Mecca Farms site were determined
to be uplands as they are completely drained, as with all citrus
operations, and thus would not revert to wetlands even when the
agricultural activity ceased.  Therefore, they are not wetlands,
but rather completely drained areas that have been permanently
converted to non-wetlands (uplands).  Absent substantial human-
induced changes, such as raising the groundwater elevation and/or
construction of a flowway, we do not expect these areas would
ever meet the wetland criteria described in the 87 Manual, at
least not in an ecological timeframe.  For mitigation, the Corps
believes that the project will provide appropriate mitigation,
which is discussed in Section 8c.  Since the project has
received water quality certification, the Corps believes that
the concerns over water quality are resolved.  The ecological
benefit of the project would be to convert frequently disturbed,
low quality active agricultural drainage ditches to stormwater
ponds with littoral plantings and native planted upland buffers.
The quality of the existing ecology is reflected in the low
Wetland Rapid Assessment Procedure (WRAP) scores of the ditches.
Secondary and cumulative effects are discussed in Section 10g,
Cumulative and Secondary Impacts.  Since the project has
independent utility, the development of adjacent properties will
be evaluated as applications are received that trigger their

-9-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

review.

     (2)  The FWS had no objections to the issuance of the
permit, but recommended that the Corps coordinate overall
project planning with the Everglades Restoration Program and
ensure a "no net loss" wetland policy.  The Corps believes that
project does not adversely impact or interfere with the goals of
the Everglades Restoration Program based on the responses from
the CERP and that the mitigation proposal ensures a "no net
loss" of wetlands as shown in the WRAP analysis.

     (3)  Many of the NMFS' concerns have been addressed in
the responses to the EPA's comments.  The comments that have not
been addressed in the EPA's response concern avoidance and
minimization as well as direct and indirect impacts.  The
avoidance and minimization concerns are addressed in Section 8.
The Corps believes that the direct impacts from constructing the
SCRIPPS development are minor and include the filling of
agricultural ditches.  The indirect impacts are discussed below
and in the secondary and cumulative impacts section, 10g.

     (4)  In evaluating the comments received from
organizations and interested parties, many requested that a
public meeting or a public hearing be held for this project.  A
public meeting would allow the organizations, interested
parties, and members of the public another opportunity to voice
the concerns.  Even though many comments were received in the
Corps' public notice comment period, the Corps would have the
opportunity to respond to each individual participant and
explain our position in person.  The Corps has considered the
request, but has determined that a public meeting is not
necessary and is not likely to provide any new information.  In
addition, the Corps will provide a news release and a question-
and-answer session for the media.  Moreover, the public has had
numerous opportunities to express its views, including in
meetings that Palm Beach County has held where the public could
comment.  The Corps attended two of these meetings where public
comment occurred.  All public comment was essentially the same
at those meetings as provided to the Corps in writing.  The

-10-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Corps' Public Affairs Office will inform the public and
interested parties of our decision through the media and on the
web, and will contact the objectors of the project to allow them
an opportunity to ask questions and receive feedback from the
Corps.  The purpose of holding a public hearing would be to
evaluate any additional information that was not presented in
the public comment period, which may change a permit decision.
The Corps has evaluated the requests and determined that a
public hearing is not necessary because additional information
to that received by the Corps in writing has not been presented
in the public meetings the Corps is aware of or has attended.
This decision is discussed in Section 12, Public Hearing
Evaluation.  Many concerned parties also believed that the
project warranted an Environmental Impact Statement (EIS).  The
Corps acknowledges that the construction of the SCRIPPS on a
portion of the Mecca Farms property may encourage further
development in the area.  However, additional development in the
area is very likely at this time either with or without the
proposal to construct the biotechnology research park on the
Mecca Farms parcel.  The Mecca Farms parcel and the Vavrus Ranch
are the two remaining privately owned parcels that are left
undeveloped in the immediate area, outside of the residential
parcels in the Acreage.  The Corps believes that development
would occur on the properties either now or in the near future,
whether the SCRIPPS project is constructed on Mecca Farms or
not.  The Corps does not believe that an EIS is warranted for
the SCRIPPS development because the applicant has proven that
the project has independent utility from any possible future
development on the remaining MECCA Farms parcel, the Vavrus
Ranch, or any possible future road construction.  Moreover,
there are adequate vacant housing opportunities in existing
communities, such as the Acreage, to fully support the proposed
research facility.  The scope of analysis does not warrant an
EIS because the unavoidable impacts to low quality agricultural
ditches associated with the SCRIPPS development can be
mitigated, and other potential development in the area will
occur with or without the SCRIPPS Biotechnology Park.  The
concerns with the cumulative impacts have been discussed in
Section 10g.  The endangered species concerns have been resolved

-11-

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

as reflected by the FWS' concurrence letter and are discussed in
the Threatened or Endangered Species Section, 10e.  The SHPO had
no concerns over any historic resources.  Therefore, the Corps'
believes that the project would not adversely affect any
historic resources.  Water quality concerns have been alleviated
by the issuance of water quality certification in the SFWMD
permit.  Because the Corps was unapprised of the location of an
alternate water storage area, the Corps requested that the
applicant provide a response to the question.  Their response is
discussed below in Section 7e, Additional Coordination.  The
concerns raised with consistency with the Comprehensive
Everglades Restoration Program (CERP) have been answered through
the response by the CERP received on 23 June 2004.  The CERP had
no adverse concerns with the project.  Mitigation is discussed
in Section 8c, and the alternative sites analysis is evaluated
and discussed in Section 8, Avoidance.  The Corps believes that
this project is a single and complete project because it has
independent utility from any future, possible development on
adjacent or neighboring lands.  The Palm Beach County has
evaluated the cost to the taxpayers and expects an economic
benefit to the area as a result of this development.  The
development on adjacent properties will be evaluated if and when
a permit application is submitted and will be processed if it
falls under the Corps' jurisdiction.  The Corps has considered
the impacts to conservation lands in Section 10a(1) and believes
that this project would not adversely affect neighboring
conservation lands.  The Corps believes that the rate of
development in Palm Beach County is determined by the local
government.  Secondary and cumulative impacts are discussed in
Section 10g, Cumulative and Secondary Impacts.  To answer the
comment about Loxahatchee watershed and the C-18 Canal
protection, the Corps has requested that the applicant provide
further description of how the project would be protective on a
watershed scale as well as provide additional information for
protecting the C-18 Canal.  The response is indicated below in
Section 7e Additional Coordination.  The potable water and
wastewater services for the biotechnological research park will
be supplied by the Palm Beach County Water Utilities Department
(PBCWUD).  This is discussed in Section 10a(14).  The Corps

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

requested that the applicant provide further information on the
plans for water storage. The response is discussed below in
Section 7e, Additional Coordination. The Corps believes that
the project is in compliance with the Palm Beach County's
Comprehensive Plan with Urban Development because the Palm Beach
County is the applicant.

(5) In evaluating the comments received from the
members of the public, several topics have already been
addressed above (the requests for a public hearing or a public
meeting, requests that the applicant perform an EIS, secondary
impacts, cumulative impacts, direct impacts, water quality
concerns, questions whether the project has independent utility,
contradiction to the CERP goals, urban development, and impacts
to the Wild and Scenic River/Loxahatchee River). Therefore,
responses to these concerns will not be reiterated in this
section. Concerns about any possible wildlife impacts have been
discussed in Section 10a(7), Fish and Wildlife. Impacts to
environmentally sensitive lands have been discussed in Section
10g, Cumulative and Secondary Impacts. The issuance of the
SFWMD permit alleviates any concerns the Corps may have with
water recharge issues. The cost of the project is a local issue
between the elected officials, the applicant, and the taxpayers.
The Corps does not believe that political influences have driven
the decisions on a federal level. The Corps stated on record at
the pre-application meeting that we would not agree to meet the
County's requested timeframe for permit issuance. The Corps has
required that the project go through the proper steps and
demonstrate the need for the project: avoidance, minimization,
and adequate mitigation for unavoidable impacts. The Corps did
recognize that the project is high profile and a decision to
permit the site would be needed quickly to avoid additional cost
to the taxpayers. Therefore, the Corps did agree to prioritize
this project and make a decision as quickly as possible. The
application review was not shortened, altered, or influenced by
any outside political person or entity. The Corps has evaluated
the loss of agricultural lands in Section 10a(10) Land use and
Section 10a(18) Food and Fiber Production. The Corps requested
that the applicant provide additional information on terrorism

-13-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

and soil testing on the MECCA property, which is discussed
below.  As stated above concerning the fast-track approach, the
Corps has properly evaluated the project and the associated
impacts.  Review times for the Corps, the public comments, and
consultation with the agencies has not been shortened.  The
public comment period was extended due to the recent hurricanes
that affected the local area.  In the public interest, the Corps
prioritized the review of this project.

     e.  Additional Coordination:  After reviewing the comments
received in response the public notice and the applicant's 12
October 2004 submittal, the Corps sent the applicant a formal
copy of the comments and requested additional information on 2
November 2004 for the concerns that had not been addressed as
indicated above.  The Corps asked for specific responses to the
public comments.  The Corps asked if a Phase 1 EA has been
performed on the site to determine if contamination has been
found in the soils and asked that supporting information be
provided.  A Phase 1 and Phase 2 Environmental Site Assessment
was conducted on the site in January 2004.  The report
recommended five areas for corrective actions and estimated the
cost associated with each action.  The Corps asked that the
applicant provide traffic information that supports the SCRIPPS
development as being independent from possible development on
the remaining Mecca Farms parcel as well as possible development
on the Vavrus Ranch.  The County provided a copy of the Palm
Beach County Resolution that approved the development for the
Biotechnology Research Park.  As part of the approval process,
traffic studies were conducted as part of the Development of
Regional Impact (DRI) approval and the Planned Industrial Park
Development (PIPD) zoning approval.  It was determined that
additional roads would not need to be constructed as a result of
the 535-acre development.  This response satisfied the Corps'
concerns.  The Corps asked for further explanation concerning
possible plans to construct a power substation in the JW Corbett
State Park.  The Corps also requested information concerning the
power supply for the proposed development, if any new structures
would need to be constructed as a result of the development, and
if there were any proposed wetland impacts associated with the

-14-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

structures or lines needed to construct the SCRIPPS development.
The Palm Beach County does have plans to construct a power
substation in the southeast corner of the J.W. Corbett Wildlife
Management Area.  This is the preferred alternative to supply a
permanent power source for the overall development on the Mecca
Farms parcel.  Another alternative is to place the power
substation on the Mecca Farms Parcel, which involves acquiring
residential land on the east side of Seminole Pratt Whitney
Road.  Since the SCRIPPS development would be supplied power
through an existing transmission line corridor through the
Acreage (which is a separate route than the two alternatives
described above), the Corps believes that the two alternatives
are not connected to feasibility of the proposed project under
review and should be evaluated separately from the SCRIPPS
permit application.  In addition, an application for activities
associated with constructing the power substation on the J.W.
Corbett Wildlife Management Area would be submitted by Florida
Power and Light rather than the Palm Beach County.  Therefore,
the Corps believes that our concerns are resolved.  The Corps
asked for a description and design plans showing the added
protective measures taken to help protect the water quality to
the Loxahatchee River, as well as for alternate sites for water
storage.  The applicant has designed the project to improve
water quality in the C-18 Canal and ultimately the Loxahatchee
River by designing the water control elevations to settle
pollutants in the impoundment before discharging into the C-18
Canal.  Also, the existing gravity discharge structure would be
modified to further restrict the discharge into the C-18 Canal.
An existing weir plate will be added, and the current pump will
not be used.  The Corps asked for a description and designs
plans showing the alternate sites for water storage.  The SFWMD
determined that the storage reservoir at the Mecca Farms site is
not needed and that other sites provided significantly more
additional storage, such as the Palm Beach County Aggregates
site.  The Corps requested a discussion of the measures
incorporated into the project that would protect the C-18 Canal
from any impacts associated with the proposed surface water
management ponds.  Best management practices, including silt
fences and turbidity curtains will be used to protect water

-15-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

quality in the C-18 Canal. A perimeter berm surrounding the 535
acres would help to prevent offsite discharges. Stormwater on
site would be treated within the on-site lakes and then routed
through culvert connection to the surface water management
ditches which would ultimately discharge to the C-18 Canal. The
existing weir will be modified to provide additional protection
to the C-18 Canal. The applicant states that the project, when
completed, will meet or exceed water quality standards in the C-
18 Canal while the existing system does not. The Corps asked if
the SCRIPPS facilities plan to include research related to
terrorism or bioterrorism. The SCRIPPS Research Institute
(TSRI) has traditionally not pursued funding for projects
directly related to terrorism or bioterrorism. The purpose of
the biotechnological research park, with TSRI as a component, is
to house a cluster of related life science research and
development activities by both public and private entities. The
activities are intended to cure and prevent illness and disease,
the development of drugs and vaccines as well as basic
biochemical research. The Corps requested that the applicant
indicate the responsible party for the long-term management of
the mitigation area and the conservation easement, as well as
provide assurances for the long-term protection of the
mitigation area. The Palm Beach County will be the responsible
party for the long-term management of the mitigation area and
the conservation area. The Corps requested a copy of the
construction and mitigation schedule and a drawing that
indicates the direction in which the water flows on and off of
the property. The applicant provided this information. The
applicant responded to the federal agencies comment letters and
submitted the requested information to the Corps on 1 December
2004. The Corps was satisfied that the applicant's response
resolved our concerns.

The Corps' project manager reviewed the applicant's
responses for protecting the adjacent water resources. Although
the Corps' concerns were satisfied with the design plans to
protect the C-18 Canal and the Loxahatchee River, the Corps
needed to evaluate the impacts the project may have on the
adjacent water resources (i.e., the wetlands on the Vavrus

-16-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Ranch).  The Corps found the adjacent wetlands located on the
Vavrus Ranch needed further evaluation to determine if secondary
impacts would occur as a result from the change in land use and
the SCRIPPS development.  After evaluating the wetlands using
the Wetland Rapid Assessment Procedure (WRAP), the Corps found
that a slight impact resulted from the new development.  To
mitigate that loss, the Corps requested that the applicant
incorporate a 50-foot minimum native upland planted buffer along
the eastern border of the SCRIPPS development.  This buffer
would serve to protect the adjacent wetlands from encroaching
development.

     f.  Project Revisions:  As a result of Corps requesting the
applicant to further evaluate indirect effects to water quality
and adjacent natural wetland systems, the project has been
modified to include a minimum of 50-foot native planted upland
buffer along the eastern side of the subject property.
Therefore, no additional coordination is required.


8.  Alternatives

     a.  Avoidance:  No less damaging alternatives were available
which would have provided the same full economic utilization of
the site.  The minimum requirements for site selection included
at least 500 developable acres to support eight million square
feet of research and development buildings, fifty thousand
square feet of retail, one thousand residential units, and a
clinic/hospital.  The first alternative considered was
construction at another site.  Five alternative locations were
evaluated by the Palm Beach County Board of County
Commissioners:  a) Parcel 19, approximately 796 acres, located
on Indiantown Road in Jupiter, b) Palm Beach Park of Commerce,
approximately 600 acres, located off of Beeline Highway, c)
Briger Tract, approximately 682 acres, located off of Central
Boulevard in Palm Beach Gardens, d) Riviera Beach CRA,
approximately 143 acres, located north and south of Blue Heron
Boulevard, and e) Florida Crystal Site, approximately 2000

                              -17-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

_____

acres, located on State Road 80, west of the L-8 Canal.
Eighteen factors broken into eight categories (developability,
community acceptability, environmental, drainage, real
estate/marketing, utilities, traffic, and cost) were considered
in evaluating the site.

        (1)  Parcel 19 is a 796.2 acre site located west of I-95
and the Florida Turnpike, and on the north and south side of
Indiantown Road in the Town of Jupiter.  There are 313.3 acres
north of Indiantown Road and 482.9 acres south of Indiantown
Road.  The Parcel 19 site was considered as a viable
alternative; however, major flaws prohibited the applicant from
selecting this site as the preferred location.  Those flaws
include the limited access from Indiantown Road, traffic issues,
and cost.  With the future construction of eight lanes,
Indiantown Road is projected to operate at 180% of capacity,
while improvements to Interstate 95 and the Florida's Turnpike
overpass would be costly.  Future expansion on the site is
possible; however, there are environmental concerns, extensive
buffer requirements, and height limitations for the buildings
along the Loxahatchee River.  Cost of the land is estimated at
$175,000,000, and on-site improvements are estimated at
$39,800,000.  The off-site road improvements are estimated at
$75,000,000, but do not address the non-operational traffic
conditions on Indiantown Road.  The cost and traffic concerns
alone create a fatal flaw for the site to be considered by Palm
Beach County as a viable alternative.  This alternative is not
practicable to the applicant, nor less environmentally damaging
because it has greater impacts to onsite wetlands and to the
Loxahatchee River itself.

The Corps believes that adverse secondary and cumulative effects
of selecting this site as the preferred alternative include
potential water quality impacts to the Loxahatchee River, water
and wastewater contributions, impacts and cost for improvements
to the Interstate 95 and the Florida Turnpike, possible
biological impacts to wetlands and listed species, population
growth, and traffic.  This site is in the final stages of
permits for the construction of a golf course, residential and

                           -18-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

hotel; large upland vegetative buffers along the Loxahatchee
River side of the proposed project were incorporated into the
site plan to help protect the portion of the River designated as
a Wild and Scenic River from human disturbance impacts and water
quality concerns.  The SCRIPPS project would be a higher human
activity use than golf course, hotel and some residential use.
Any changes to the current permit process on this site would
require similar measures to ensure protection.  For the reasons
stated above, the Corps would not prefer this site to be
selected.

    (2)  Palm Beach Park of Commerce site is a 1,243-acre
site located on the north side of Beeline Highway and east of
the intersection of Seminole Pratt Whitney Road.  Any discussion
concerning residential housing and commercial development in
this section only pertains to the residential and commercial
development planned on the 535 acres of property on the Mecca
Farms parcel.  The Palm Beach Park of Commerce site is zoned as
a "PIPD" (Planned Industrial Park District) and is approved for
the development of a variety of commercial and industrial
facilities.  A majority of the site contains existing
development; some of the tenants include the Rockefeller Group
Foreign Trade Zone (which is a zone that is treated as though it
were located outside the United States for customs duty
purposes), a Walgreens Distribution Center, a General Motors
Distribution Center, FIMCO Manufacturing, A1 Moving and Storage,
as well as other commercial development.  This site is
considered in the alternatives analysis; however, the applicant
has concerns with developing this site.  The site is an
industrial setting and, regardless of landscaping, would result
in a much different atmosphere from what is envisioned for the
SCRIPPS research park.  Changes in zoning would need to occur to
allow residential development on the site.  Much of the site is
currently developed, with the majority of the existing
development located in the northern and central portion of the
site.  The property available for development is located mainly
in the southern portion of the site.  The available property
includes approximately 350 acres zoned for light industrial, 100
acres zoned for general industrial, and 100 acres zoned for

-19-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

commercial.  Even though the site contains enough available
developable property to construct the biotechnological research
park, the amount of property suitable for the site-specific
development is limited.  Areas where residential development
could occur on the site are limited because the southern portion
of the site falls within the airport's prohibited land use
buffer area where residential use is discouraged.  Thus, the
southern portion would need to be reserved for the research
facilities.  The railroad line, which borders the southern
portion of the site, would cause complications for research and
development uses due to vibrations and noise.  Research
equipment, such as electron microscopes and other imaging
equipment cannot tolerate even minimal vibration.  Therefore,
constructing the research development in the southern portion is
also not feasible to the applicant.  Because of this, some of
the existing development located in the northern portion of the
site would need to be relocated.  Even though the land costs are
reasonable, relocating the current tenants may be costly.  The
cost of current tenant relocation, aesthetics, vibration and
noise from the railroad, and limited areas of development cause
this site to be unacceptable to the applicant.

The Corps believes that adverse secondary and cumulative effects
of selecting this site as the preferred alternative include
urban design, land use planning, population growth, residential
housing on Mecca Farms, transportation and traffic concerns, and
biological impacts.  Displacing the current tenants would
possibly create impacts on another nearby site.  In evaluating
cumulative impacts of foreseeable future development, it must be
considered that this site would not support the level of total
future development that the County anticipates on the remainder
of the Mecca parcel, whether or not the Scripps Institute is
built there.  To satisfy this anticipated future need and
recognizing the scarcity of developable upland alternatives,
this alternative would propose in the future to construct the
additional residential development on the Mecca Farms parcel.
To access the residential development on the Mecca Farms site
from the Park of Commerce the future proposal also includes the
construction of Seminole-Pratt Whitney Road from the Beeline

-20-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Highway to the existing portion of Seminole-Pratt Whitney Road.
The construction of Seminole Pratt Whitney Road would impact
biological resources, wetlands, and the wildlife corridor by
bisecting the preserved lands and creating a dangerous
obstruction to wildlife movement.  Anticipated additional
residential development on the Mecca Farms parcel would cause
the secondary and cumulative effects to occur as discussed with
the development of the Mecca Farms site in addition to the
secondary and cumulative effects of developing the project on
the Park of Commerce site.  The Corps also believes that many of
the adverse comments and concerns received as a result of
development on Mecca would continue to be raised with the Palm
Beach Park of Commerce site because residential development
would also be proposed on the Mecca Farms site.  Additional
development opportunities for spin-off development would
potentially occur at United Technologies/Pratt Whitney, which is
located immediately west across the Beeline Highway from the
Park of Commerce site.  Therefore, the Corps is not in favor of
the applicant selecting this site as the preferred alternative
due to the compounded cumulative impacts associated with
constructing the biotechnological research park on the Palm
Beach Park of Commerce site and the residential development on
the Mecca Farms site, the impacts associated with constructing
Seminole-Pratt Whitney Road, additional development on Beeline
Highway, and potential impacts associated with displacing the
current tenants.

        (3)  The Briger Parcel is 682.63 acres of land and is
located in the City of Palm Beach Gardens, south of Donald Ross
Road, north of Hood Road, and east of the Florida Turnpike.  Any
discussion concerning residential housing and commercial
development in this section only pertains to the residential and
commercial development planned on the 535 acres of property on
the Mecca Farms parcel.  There are 475.69 acres located east of
I-95 and 206.94 acres located west of I-95.  The site contains
approximately 53.68 acres of wetlands, and 628.95 acres of
uplands.  Even with approximately 133 acres of uplands reserved
for preservation as the Palm Beach County code requires, the
site could support the biotechnological research park.  However,

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

the applicant would not prefer to construct the biotechnological
research park on this site because of several issues.  Land
costs are a major issue, which are estimated at $187,550,000.
Because I-95 intersects the parcel, the total planned
development would be divided into two separate areas, presumably
with the residential development on one side of I-95, and the
commercial development on the other side.  The applicant would
need to construct a bridge over I-95 to connect the two parcels,
which would increase the cost associated with the project.
Also, since the Briger Parcel would directly impact freshwater
wetlands, the mitigation for those impacts would likely be more
than mitigation required for impacting drainage ditches.
Secondary and cumulative effects include possible traffic and
road improvements, expansion of the water and wastewater
treatment plant, and limited possible future expansion areas.
These issues, i.e., costs associated with land purchase,
division of development, costs to achieve connect-ability, and
mitigation costs, make this site undesirable to the applicant.

The Corps believes that adverse secondary and cumulative effects
of selecting this site as the preferred alternative include
increase in traffic, removal of native wetlands and forested
uplands that are in communication with nearby undeveloped areas,
induced growth, potential for increase in development on private
parcels, utilities with the expansion of the required water and
wastewater treatment plant expansions, and biological impacts.
With an increase in traffic, possible future plans for the area
may include expansion of nearby roads.  Because 130 acres of
uplands would need to be preserved as required by the Palm Beach
County codes, many of the wetlands on the site would need to be
impacted to achieve the designs for construction on 535 acres of
land.  Although many of the wetlands on the site are highly
degraded with lack of hydrology and invasion of exotic plant
species, construction on this site would directly impact native
wetlands and forested uplands.  Removing the native wetland and
forested uplands from this area would have an adverse effect on
the adjacent native land to the south of the site, as well as
the Loxahatchee Slough located to the west.  Northern Palm Beach
County has very few large tracts of privately owned land

-22-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

available for development.  The removal of one has adverse
effects on the remaining tracts because less land is available
for wildlife communication and connection.  Development on the
Briger parcel would increase development on nearby residential
and commercial areas, including the Vavrus Ranch and Mecca Farms
parcel.  It must also be noted that Palm Beach County attempted
to purchase this site for preservation as environmentally
sensitive lands; however, the cost was too high.

Much of the infrastructure elements that are proposed on Mecca
Farms (commercial development, restaurants, residential,
university, I-95 interchange) already exist along Donald Ross
and the immediate area.  Many of those accommodations would not
need to be constructed if development were to occur on Briger.
Also, the wetlands in and around Briger are already bounded by
development on all sides, intersected by I-95, and impacted by
two well fields.  The hydrology has been severely altered on the
site, which has caused the wetlands to become degraded and
overtaken with exotic species.  Portions of the historic
wetlands no longer meet the Corps' definition of a wetland under
the Corps' 1987 Wetland Delineation Manual.  If this site were
selected, minor secondary and cumulative impacts would occur,
however, native wetlands (although degraded) would be impacted.

        (4)  The Riviera Beach CRA contains approximately 800
acres located along the eastern edge of the City of Rivera Beach
from Silver Beach Road on the north to the Port of Palm Beach to
the south.  The site has been evaluated as a potential site but
determined to not be a viable option due to the lack of
developable land, costs associated with relocating U.S. Highway
1, unconnected development of research buildings, potentially
contaminated soils, schedules, and right-of-way issues.

The Corps has evaluated secondary and cumulative impacts
associated with this site.  Socioeconomic factors, stormwater
and water quality treatment, impacts to Lake Worth, expansion
areas, and traffic concerns would result if this site were
selected for the development.

-23-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

        (5)  Florida Crystals Site is approximately 2000 acres
located on the west side of the L-8 Levee, north of State Road
80.  The land is currently in agricultural use and is zoned for
Special Agricultural and Agricultural Production.  Due to the
site's location, the applicant has taken this alternative out of
consideration.  Commercial and residential development on this
site would threaten the agricultural production in the area
where no development at any intensity is currently allowed.
This would also open the western, agricultural area for
development.  The uncertainty and time associated with
permitting this site for the proposed development is risky to
the applicant.

The Corps has evaluated secondary and cumulative impacts
associated with this site.  Expansion of development into
agricultural resources, roadway expansions, increase in
associated development, impacts to the CERP, water flow
alterations, utilities, land use planning, urban design, and
environmental concerns would occur if this site were selected
for development.

        (6) Mecca Farms site is a viable alternative.  It is
currently used as a productive citrus grove and an active sand
mine.  Development of the site would cause impacts to drainage
ditches.  Land may be available on the remaining Mecca Farms
parcel for future expansion; however, permitting the future
development will be required.  Access to the site can occur from
existing roads.  The cost per acre is $30,000, which is
reasonable to the applicant.  Although in citrus production, the
site is not in the agricultural reserve.

The Corps has evaluated secondary and cumulative effects
associated with developing this site.  The Corps believes that
adverse secondary and cumulative effects of selecting this site
as the preferred alternative include increase in traffic,
induced growth, potential for increase in development on private
parcels, utilities, and roadway expansions.  Further secondary
and cumulative impacts for this alternative have been discussed
in Section 9, Section 404(b)(1) Guidelines Evaluation and in

                              -24-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Section 10g, Cumulative and Secondary Impacts.

Two alternatives appear to be practicable to the applicant: the
Briger Tract and the Mecca Farms parcel.  However, the Briger
site is clearly more expensive, and the applicant has stated
that it is not practicable.  Moreover, in comparing the adverse
effects of developing each site, the Corps believes that there
is an overall insignificant difference in the impacts to the
aquatic environment.  Direct effects:  In general, direct
impacts to agricultural ditches cause less environmental impacts
to the aquatic environment than direct impacts to natural
wetland systems.  Although a WRAP was not performed to quantify
the value of the wetlands on the Briger tract, a site visit
indicated that the wetlands on the Briger tract are low in
quality.  The hydrology has been severely altered on the site,
which has caused the wetlands to become degraded and overtaken
with exotic species.  Portions of the historic wetlands no
longer meet the Corps' definition of a wetland under the Corps'
1987 Wetland Delineation Manual.  The wetlands in and around
Briger are bounded by development, intersected by I-95, and are
experiencing hydrological impacts from two nearby well fields.
These conditions adversely affect wildlife utilization and
interaction with the wetlands.  The majority of the aquatic
species utilizing the site are avian.  Direct impacts at the
Mecca Parcel are to drainage ditches with a low function and
value due to side slopes, periodic maintenance, and water
quality.  The wildlife species that utilize the ditches include
avian, reptile, and fish.  By choosing the Mecca Farms parcel
over the Briger site, the applicant has demonstrated avoidance
and minimization of wetland impacts by choosing a location with
impacts to agricultural ditches.  However, with such a low
function and value of the wetlands on the Briger tract, the
Corps believes that there is an insignificant difference in the
direct impacts to the agricultural ditches found on Mecca Farms
and the wetlands found on the Briger tract.  Indirect effects:
Even though there is very little wildlife and hydrologic
connection on the Briger tract, complete development would
remove the wildlife association with the adjacent undeveloped
land to the south and eliminate any hydrologic connection the

-25-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

site has to the south and the west. The Mecca Farms parcel is
an active orange grove with very little wildlife utilization.
The wildlife typically utilizes the J.W. Corbett Wildlife
Management Area, Unit 11, Vavrus Ranch, and the Loxahatchee
Slough. There is little need for wildlife to travel through the
orange grove since the preserved, undeveloped lands exist to the
west, north, and east of the Mecca Farms Parcel. The Mecca
Farms site with the incorporation of vegetative upland buffers,
has minimized impacts to the adjacent off-site wetlands.
Therefore, there is an insignificant difference in the adverse
impacts to off-site wildlife utilization between the two sites
since both sites are not heavily utilized by wildlife due to
their location. Secondary and cumulative: When the secondary
and cumulative effects are analyzed between the Mecca Farms and
the Briger Tract, the difference is insignificant. Much of the
infrastructure elements that are proposed on Mecca (commercial
development, restaurants, residential, university, I-95
interchange) already exist along Donald Ross. Therefore, spin-
off development is predicted to occur in the remaining
undeveloped areas not currently under preservation. This
includes development on Mecca Farms and the Vavrus Ranch. On
the same note, development on the Mecca Farms site would also
encourage development on the Briger tract. These two parcels
are close in proximity, within the same commuting range, and
subject to the same pressures for development in northern Palm
Beach County. If the biotechnological research park development
were to occur on the Mecca Farms site, the increase in
development on the available private lands, including Vavrus
Ranch, would occur because of the development pressures. The
rate of development would occur at a slightly faster rate than
if built on Briger for the simple fact of location. However,
the rate is expected to be insignificant due to the intense
development pressures. This development pressure makes it
extremely difficult to quantify the rate. As stated above,
development on private lands, such as Vavrus is a potential
adverse cumulative impact for both sites. The Loxahatchee River
Basin Wetland Planning Project for Palm Beach County dated 1
July 1999, states that the Vavrus Ranch is one of the largest
areas containing wetlands that have not been protected. The

-26-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Palm Beach County has identified portions of the property as
areas desirable to purchase for conservation and recreational
uses. The areas for conservation, presumably would be located
in areas to protect the C-18 Canal and the Loxahatchee Slough.
In the same note, the portions of the property not purchased for
conservation would be suitable for development. The applicant's
preferred alternative is the Mecca Farms site. With the
insignificant difference in the adverse indirect, secondary, and
cumulative impacts between the Mecca Farms site and the Briger
tract, the Corps defers to the applicant's site selection.

   b. Minimization: The proposed site, which is the Mecca Farms
parcel, consists of orange groves with drainage ditches. Due to
the poor quality, the spacing of the drainage ditches, and the
number of drainage ditches on the site, avoidance of the surface
water ditches is not a viable consideration. Selection of an
alternate site would result in greater impacts to waters of the
United States or to special aquatic sites because the Mecca Farms
site has been previously impacted with agricultural and mining
activities and would impact agricultural ditches rather than
freshwater wetlands. Improvements to the water treatment before
discharging into the C-18 Canal would also be beneficial to the
water quality in the C-18 Canal as well as the Loxahatchee River.

   c. Mitigation: The jurisdictional ditches are primarily
open water ditches with a steep side-slope and a narrow fringe
of exotic vegetation. Typically, open water ditches could be
replaced with stormwater management ponds because the function
and value of the open water is replaced. Because many of the
ditches on the Mecca Farms parcel were historically excavated
through wetlands, wetland compensation is needed. Therefore,
the Corps would not allow the creation of stormwater ponds as
the sole element for compensatory mitigation to offset the
function and value of the ditches. Rather, the Corps will
replace the function and value of the impacted ditches with a
combination of littoral plantings, open water, and upland
plantings.

The applicant proposes compensatory mitigation for 21.3 acres of

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

unavoidable adverse impacts to jurisdictional drainage ditches
as the creation of ±40.4 acres of stormwater management ponds (a
±20.4-acre lake expansion at the existing 27.6-acre mining
quarry and new ±20-acre lake), approximately 6.3 acres of
littoral marsh plantings, approximately 1.1 acres of forested
wetland plantings, a minimum of 150-foot native planted upland
buffer located between the existing Acreage development and the
stormwater management pond, and a minimum of 50-foot native
planted upland buffer between the proposed development and the
Vavrus Ranch property. The upland preserve areas total
approximately 17.5 acres.

The impact and proposed mitigation sites were evaluated using
the Wetland Rapid Assessment Procedure (WRAP). A WRAP score of
0.38 was calculated for the ditches, resulting in 8.1 debits for
the proposed impacts. The littoral areas located on the western
side of the site (approximately 1.9 acres) were projected to
provide a post-project WRAP of 0.67, while the littoral areas
located on the southern side of the site were projected to
provide a post-project WRAP of 0.68. Considering a 2-year time
lag and 10 percent risk of failure, the littoral shelf
mitigation areas provide 1.13 and 3.31 credits, respectively.
Secondary effects were evaluated for the off-site wetlands
located on the Vavrus Ranch. Construction of the project would
result in a delta of -0.05 to the adjacent wetlands. To offset
this loss, the Corps requested that the applicant provide a
buffer between the offsite wetlands and the development. The
applicant offered to preserve a minimum of 50-foot native,
upland planted natural area to serve as a wildlife corridor as
well as a serve to buffer the offsite wetlands. This is
intended to offset the loss of function and value of the off-
site wetlands from the changing use. The Corps did not use WRAP
to directly assess the 150-foot upland preserve area. This
preserve area was considered in evaluating the littoral areas
because it provides a corridor, upland buffer, and dry detention
for water quality. The Corps also did not use the WRAP to
evaluate the open water areas for mitigation credits as these
areas are being constructed for surface water management
purposes. The Corps recognizes the open water areas will

-28-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

provide some function and value.  As well a percentage of the
impact site is open water habitat.  The Corps believes that the
open water habitat created through the stormwater management
system will provide enough function and value to offset the
remaining 3.66 debits from filling of the jurisdictional
ditches.  Therefore, the Corps believes that the loss of 21.3
acres of drainage ditches is offset through the creation of
±40.4 acres of stormwater ponds, planting of approximately 6.3
acres of littoral marsh, planting of approximately 1.1 acres of
forested wetland, and the creation, enhancement, and the
preservation of 17.5 acres of upland buffers.  This proposal
will replace the function and value of the existing
jurisdictional areas.

The mitigation has been computed as follows using the WRAP
evaluation:

| Polygon | existing WRAP | with project WRAP | Delta | Functional Capacity Units FCU's | 2 year Time lag (0.9833) 10% Risk |
|---|---|---|---|---|---|
| Ditches | 0.38 | 0 | -0.38 | -8.1 | -8.1 |
| Littoral-S | 0 | 0.68 | +0.68 | 3.74 | 3.31 |
| Littoral-W | 0 | 0.67 | +0.67 | 1.27 | 1.13 |
| Stormwater pond | | | | | 3.66 |
| Upland buffers | | | | | |
| Vavrus wetlands | 0.77 | 0.72 | -0.05 | | |
| | | | | | |
| Total | | | | | **0** |

     d.   Project As Proposed:  The project as proposed does not
adversely impact waters of the United States because the
function and value will be replaced through the mitigation plan.

     e.  Conclusions of Alternatives Analysis:  Review of the

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

project concludes that avoidance and minimization of impacts to
waters of the United States was utilized to the most practicable
extent.  The mitigation off sets the wetland impacts, and
therefore, no net loss of wetland function is anticipated.  The
project as proposed with the mitigation proposal represents the
least environmentally damaging practicable alternative.

9.  Section 404(b)(1) Guidelines Evaluation:

     a.  Factual Determinations (230.11):

        (1)  Physical Substrate (230.11(a)):

        a.  Physical Compatibility:  The Soil Survey of Palm
Beach County describes the soils on the project site as being
Riveria Sand, Riveria Sand Depressional, Hallandale Sand, Boca
Fine Sand, Floridana Fine Sand, and Wabasso Fine Sand before
agricultural use.  Currently, the site contains fill material to
support the citrus and mining operations.  Sands, limestones, and
shelly sandstone/cemented sands of the Anastasia Formation
underlie the site.

        b.  Extent of substrate changes:  To develop the site,
the surface organics (grasses/weeds) will be removed, stockpiled,
and used as fill material for landscape berms.  The vegetation
would be removed and the site grades would be raised to assure
that building foundations and roadways are constructed above
potential flooding elevations.  Clean fill material would be used
to achieve the required grades.  The fill material is expected to
be from on-site sources, so the substrate should not be expected
to change extensively from existing conditions.

        c.  Changes in bottom contours:  The existing ground
elevation varies at the site from approximately 24.0 feet NVGD to
20.5 feet NVGD.  The bottom contours proposed in the surface water
management lakes are set at -10.8, will rise to elevation 15.5 and
then be constructed at a 10:1 slope until break elevation of 16.0.
Littoral wetlands plant species will be planted in this area,
approximately 35 feet in width.  The pond would rise at a 4:1

-30-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

slope to a top of bank elevation of 21 NVGD.  Wetland plant
species will be planted in this area, which is approximately 10.8-
feet in width.  The lake maintenance easement area, approximately
20 feet in width will slope to match the existing ground elevation
at 21.1 NVGD.  Other areas are similar.  The slight differences
could be found in the attached permit drawings, pages 8 through
15.

        (2)  Water Circulation, Fluctuation, and Salinity
(230.11(b)):

        a.  Current patterns and Circulation:  The current water
flow has been designed to flow north or south from the existing
road towards a major canal that runs east to west.  From any east-
west road, the northern ditches allow water to flow to the north
into a major canal running east-to-west.  The southern ditches
allow water to flow south into the major canal running east-to-
west.  All east-to-west canals transport water to the center of
the site, where it travels north within a major north-to-south
oriented canal.  The site is freshwater so salinity is not
applicable.

        b.  Municipal and private water supplies:  The potable
water supply would be provided from off-site by the Palm Beach
County Water Utilities Department.  Irrigation will be withdrawn
from the on-site lakes, with recharge from the C-18 Canal as
needed.  The consumptive water use permit has been issued to
supply the irrigation demands from the C-18 Canal.

        (3)  Suspended Particulate/Turbidity (230.11(c)):

        a.  Turbidity control:  Erosion and sediment controls,
including stabilization and structural practices, will be utilized
on the site during all construction activities.  Stabilization
practices include temporary seeding, permanent seeding, mulching,
geotextiles, sod stabilization, vegetative buffer strips,
protection of trees, and preservation of mature native vegetation.
Structural practices include silt fencing, earth dikes,
diversions, swales, sediment protection, rock outlet protection,

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

reinforced soil retaining systems, gabions, and temporary or
permanent basins.  Stormwater management controls, which include
best management practices and velocity dissipation devices, will
be utilized on site.  Best management practices include stormwater
detention and retention systems, open vegetated swale flow
attenuation, infiltration of runoff onsite and combined practice
sequential systems.  Other potential pollutant controls include
waste disposal, off-site vehicle tracking, compliance with state
and/or local wastewater, sanitary sewer or septic system
regulation and limited application, generation, and migration of
toxic substances.

        b.  Duration of turbidity:  Turbidity is expected to
occur during the construction phase of the project.  The measures
incorporated above would minimize any water quality impacts.

        (4)  Contaminant Availability (230.11(d)):

        a.  Physical characteristics:  The site is an active
orange grove with a sand mining operation.  A Phase 1 and Phase 2
EA was performed on the entire 1919-acre Mecca Farms site.  The
Phase 1 analysis identified 25 areas of potential environmental
concern based on historical and current activities.  The Phase 2
assessment identified five areas where corrective actions should
occur as a result from soil and groundwater samples:  a burn area,
a former shed/staging area, the maintenance shop, refueling area,
and the irrigation pump stations.

        b.  Hydrology in relation to known or anticipated sources
of contaminants:  The existing groundwater levels are managed and
controlled through the surface water ditches.  The water table has
been measured to vary between 4 to 5 feet below land surface
during the Phase 2 Environmental Site Assessment.  Several areas
within the quarry, staging area, maintenance area, and citrus
grove area were tested for soil and groundwater contamination.
Out of all of the areas and samples taken, one sample in the
former shed area exhibited cadmium slightly above the groundwater
cleanup target level.

-32-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

        c.  Previous testing:  Testing was conducted during the
Phase 2 Environmental Site Assessment.
        d.  Known sources of contaminated upland runoff:  The
report did not have any records of known sources of contaminated
upland runoff.

        e.  Records of petroleum or hazardous substance spills:
The report did not indicate if any spills occurred on the site.
However, the analytical results indicated dark soil staining and a
strong used oil odor from a soil sample under the maintenance shop
bay area.  The groundwater results were not above the groundwater
cleanup target level at this area.

        (5)  Aquatic Ecosystem Effects (230.11(e)):

        a.  Structure of ecosystem:  The site contains an active
open-water quarry and drainage ditches with nuisance or exotic
plant species along the littoral fringe of the ditches.  The site
is used by a limited amount of wildlife (turtles, alligators, and
birds).  The remaining of the site contains orange trees.

        b.  Ecosystem functions:  The ecosystem has little
function and value as an aquatic ecosystem because of the frequent
human disturbance, routine maintenance of vegetation within the
ditches, maintenance of the orange groves, and disturbed aquatic
environment.  The site does not display natural habitats or
ecosystems as found in the surrounding areas.

        c.  Threatened or endangered species:  An environmental
assessment (EA) was conducted on the site in April 2004.  It found
that the site does not contain any federally listed threatened,
endangered species, or species of special concern.  The drainage
ditches did not appear to be suitable habitat due to the side
slopes and human disturbance.  Even though the report did not find
any listed animal species, it did state that the potential exists
for a listed species, the American alligator, to utilize the site.
The Corps has completed consultation with the FWS pursuant to
Section 7 of the Endangered Species Act.  It has been determined
that the project would not adversely affect any listed federally

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

listed species.

        d.  Special aquatic sites:  The site does not contain any
special aquatic sites, other than the low ecological value wetland
fringes along the ditches.

        e.  Wildlife:  The wildlife observed on the site was
limited but included reptiles and birds in the ditches and egrets
perched along the north side of the quarry.  Compensatory habitat
for wildlife will be provided through the mitigation proposal.

        (6)  Proposed Disposal Site (230.11(f)):  The existing
citrus trees would need to be cleared and grubbed.  The root balls
and tree stumps would be excavated and disposed.  Disposal
consists of grinding/shredding of the trees and stumps and either
offsite disposal at an approved designated area and/or stockpiling
and drying the material onsite and burning with the approved
permits.  The project would not dispose of any fill material
offsite.  All fill material needed on the site will be excavated
as a result of the creation of the stormwater management ponds.

        (7)  Cumulative Effects (230.11(g)):

        a.  Other similar projects (historical) in the
area/watershed:  There are limited other similar projects in the
immediate area because there are limited other agricultural lands
in the area.  Such other large open land in the area is generally
either publically owned or subject to similar development
pressure.  The Vavrus Ranch does contain areas that are used for
agricultural purposes.  However, development is not proposed on
that site at this time.  The Corps is currently processing an
application for a development on a portion of an orange grove that
is located west of the Acreage and south of J.W. Corbett Wildlife
Management Area.  The property was formerly known as Indian Trails
Groves.  The Corps is claiming the on-site ditches and any impacts
to wetlands that have not been previously filled during
agricultural operations.  The Corps also has permitted other
development on property used as orange groves in Palm Beach County
as well as in the South Florida area.  The Corps is currently
evaluating a project submitted by the Department of Veterans

-34-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Affairs to construct a national veterans cemetery in Palm Beach
County. The Corps requested the applicant provide a detailed
analysis of why an agricultural site, which was considered in the
alternatives analysis, was not selected as the preferred
alternative. The agricultural site contained less proposed
wetland impacts than the preferred alternative site.

        b. Anticipated similar projects in area/watershed: The
Corps believes that similar development may be proposed on the
remaining Mecca Farms parcel as well as the adjacent Vavrus Ranch
property. These parcels are the last remaining undeveloped
privately owned parcels in the area, with the exception of the
single-family residences located to the south of the Mecca Farms
site. Further development may occur on the Indian Trail Groves
site as well.

        c. Anticipated future consequences: This project may
entice further proposed development on the remaining Mecca Farms
site or the adjacent Vavrus site. However, this project has
independent utility from the future proposed sites. Once permit
applications are submitted for future proposed projects, the Corps
will have the ability to evaluate those projects. Moreover,
development pressure is intense in northern Palm Beach County, and
it is likely that the remainder of Mecca Farms and portions if not
all of Vavrus Ranch will be subject to proposed residential and
commercial development. This development pressure is expected in
the same time horizon, the next few years, whether or not the
SCRIPPS Biotechnology Park is constructed on Mecca Farms.

        (8)  Secondary Effects (230.11(h)): Because the site has
been previously filled during agricultural practices, the Corps
does not expect further leaching to occur as a result of fill to
construct the SCRIPPS development. Surface water runoff is
expected to be minimal due to the turbidity control measures and
best management practices incorporated into the project.
Hydroperiod changes are also expected to be minimal since the
impacts are to surface water drainage ditches. Secondary effects
on adjacent natural systems have been eliminated due to the
establishment of an upland buffer between the development and the

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

offsite wetland areas.  The proposed project allows for a wide
shallow flowway along the western edge of the Mecca Farms site for
future use moving water north to C-18 and the Loxahatchee Slough.

   b.   Restrictions on discharges:

      (1)   Alternatives (See paragraph 8):

      (a)   The activity is located in a special aquatic site
(wetlands, sanctuaries and refuges, mudflats, vegetated
shallows, coral reefs, riffle and pool complexes, etc.)
      yes( X ) no( ) (low value wetland fringes on ditches)

      (b)   The activity needs to be located in a special
aquatic site to fulfill its basic purpose.   yes( ) no(**X**)

      (c)   It has been demonstrated in paragraph 8 above that
there are no practicable nor less damaging alternatives which
would satisfy the project's overall purpose. yes(**X**) no( )

      (d)   The least damaging alternative has no other
significant environmental effects.   yes(**X**) no( )

      (2)   Other program requirements:

      (a)   The proposed activity violates applicable State
water quality standards or Section 307 prohibitions or effluent
standards.   yes( ) no(**X**)

      (b)   The proposed activity jeopardizes the continued
existence of federally listed threatened or endangered species
or affects their critical habitat.      yes( ) no(**X**)

      (c)   The proposed activity violates the requirements of
a federally designated marine sanctuary.      yes( ) no(**X**)

      (3)   The activity will cause or contribute to
significant degradation of waters of the United States,
including adverse effects on human health; life stages of

-36-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

aquatic organisms; ecosystem diversity, productivity and
stability; and recreational, esthetic, and economic values.
     yes(  ) no(**X**)

     (4)  Minimization of adverse effects:

     (a)  Appropriate and practicable steps have been taken
to minimize potential adverse impacts of the discharge on the
aquatic ecosystem.  yes(**X**) no(  )

     (b)  Compensatory mitigation:  The applicant proposes
compensatory mitigation for unavoidable adverse impacts to 21.3
acres of ditches through the creation of ±40.4 acres of
stormwater management ponds (a ±20.4-acre lake expansion at the
existing 27.6-acre mining quarry and new ±20-acre lake),
approximately 6.3 acres of littoral marsh plantings,
approximately 1.1 acres of forested wetland plantings, a minimum
of 150-foot native planted upland buffer located between the
existing Acreage development and the stormwater management pond,
and a minimum of 50-foot native planted upland buffer between
the proposed development and the Vavrus Ranch property.
Therefore, the applicant's proposal would replace the existing
functional value.

     c.  Findings:  The Corps reviewed the proposed project in
accordance with the 404 (b)(1) Guidelines.  The review
demonstrates that the Corps analyzed all of the alternatives and
that the proposed alternative is the least environmentally
damaging and practicable alternative considering expense, public
need, existing technology, logistics, and the site selection
process.  The project complies with the Guidelines because the
project would not cause or contribute to violations of State
Water quality standards, jeopardize the existence of any
endangered species or affect a marine sanctuary.  The Corps does
not expect significant degradation and the applicant has taken
all available practicable steps to minimize impacts.  The Corps
has added these special conditions to the permit to ensure that
significant degradation does not occur.

-37-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

    (1)  Fill material used with this project shall be
limited to suitable, clean fill material, which excludes
materials such as trash, debris, car bodies, asphalt,
construction materials, concrete block with exposed
reinforcement bars, and any soils contaminated with any toxic
substance in toxic amounts (see Section 307 of the Clean Water
Act).

    (2)  Reduction and/or elimination of turbid water
conditions in adjacent waterbodies are to be achieved through
the use of silt curtains or screens in the construction during
periods of fill placement.

    (3)  Appropriate soil erosion and sediment controls must
be used and maintained in effective operating condition during
construction, and all exposed soil and other fills, as well as
any work below the ordinary high water mark or high tide line,
must be permanently stabilized at the earliest practicable date.

    (4)  Within one year of the date of this permit, the
permittee shall plant the surface water management ponds with
wetland plant species in the 12-foot littoral shelf
(approximately 6.6 acres).  The littoral shelves shall be
maintained with coverage of at least 80% native wetland plant
species and with less than 5% nuisance plant species and less
than 1% exotic plant species in perpetuity.  The planting shall
be conducted in accordance with the mitigation plan submitted to
the Corps dated 9 December 2004.

    (5)  Within one year of the date of this permit, the
permittee shall plant native upland plant species within the
minimum 50-foot native upland buffer located on the eastern
border of the site adjacent to the Vavrus Ranch and the 150-foot
native upland buffer located on the southern border of the site
between the stormwater pond and the Acreage development.  The
upland buffers shall be maintained with coverage of at least 80%
native upland plant species and with less than 5% nuisance plant
species and less than 1% exotic plant species in perpetuity.
The planting shall be conducted in accordance with the

-38-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

mitigation plan submitted to the Corps dated 9 December 2004.

(6)  The permittee shall subsequently submit annual
monitoring reports for a period of five years, the first no
later than one year after the submission of the initial report.
Each monitoring report shall provide a narrative, professional
biological opinion of the condition of the conservation area, a
plan view describing the vegetative community, a list of species
and their percent cover for each community, the percent cover of
wetland and of exotic plant species, the sum of the survivors of
those planted plus those recruited, a description of any unusual
climatic or other factors, and panoramic photos from the same
points as where the photos for the initial report.

(7)  The mitigation areas shall be considered successful
when all of the following criteria are met: the canopy of native
wetland plant species reaches 80 percent cover (that is, the sum
of the survivors of those planted plus those recruited); the
number of individual plants per unit area (the sum of survivors
of those planted plus those recruited) equals 80% of the number
of individuals planted; the vegetation, planted or existing,
must show evidence of normal growth and reproduction, and the
attached WRAP scores are achieved within two years from the date
of permit issuance.  If the wetland mitigation areas have not
reached the projected WRAP scores at the end of the second year
of monitoring, the Corps will determine if the "with-project"
WRAP scores can be achieved with additional planting,
excavation, monitoring, changes in control elevations, and/or
other actions to achieve these scores.  If the Corps determines
the projected WRAP scores cannot be achieved, the permittee will
be required to provide additional mitigation.

(8)  The preserved areas, comprising of the 6.6 acres of
littoral areas, the minimum 50-foot native upland buffer located
on the eastern border of the site, and the 150-foot native
upland buffer located on the southern border of the site shall
be placed under a conservation easement.  Within one year from
the date of permit issuance, the permittee will have a legally
sufficient conservation easement prepared to ensure that the

-39-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

wetland areas will remain in their natural state in perpetuity.
The conservation easement will encompass the 6.6 acres of
littoral areas.  These natural preserve areas will not be
disturbed by any dredging, filling, land clearing, agricultural
activities, planting, or other construction work whatsoever.
The permittee agrees that the only future utilization of the
preserved areas in question will be as a purely natural area.

The permittee will prepare the proposed conservation easement,
including a legal description, survey, and scale drawings, of
the area in question and furnish the same to the Jacksonville
District Office of Counsel, c/o the Regulatory Division,
Enforcement Section, Post Office Box 4970, Jacksonville, Florida
32232-0019, for legal review and approval.

        (9)  Within 30 days of U.S. Army Corps of Engineers'
approval of the proposed easement, the permittee will record the
easement in the public records of Palm Beach County, Florida.  A
certified copy of the recorded document, plat, and verification
of acceptance from the grantee will be forwarded to the
Jacksonville District Office.  The recordation and notification
to the District Office must occur prior to the discharge of any
additional fill authorized under this permit.

        (10)  The permittee must show that it has clear title to
the real property and can legally place it under a conservation
easement.  Along with the submittal of the draft conservation
easement, the Permittee shall submit a title insurance
commitment for the property, which is being offered for
preservation.  Any existing liens or encumbrances on the
property must be subordinated to the conservation easement.  At
the time of recordation of the conservation easement, a title
insurance policy must be provided to the Corps in an amount
equal to the current market value of the property.

        (11)  In the event the permit is transferred, proof of
delivery of a copy of the recorded conservation easement to the
subsequent permittee or permittees must be submitted to the
Corps together with the notification of permit transfer.

-40-

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement of Findings for the Above-Numbered Permit Application

---

(12)  Grantee shall not assign its rights or obligations under this conservation easement except to another organization qualified to hold such interests under the applicable state and federal laws, including §704.06 Florida Statutes, and committed to holding this conservation easement exclusively for conservation purposes.  The Corps shall be notified in writing of any intention to reassign the conservation easement to a new grantee and must approve the selection of the grantee.  The new grantee must accept the assignment in writing and a copy of this acceptance delivered to the Corps.  The conservation easement must then be re-recorded and indexed in the same manner as any other instrument affecting title to real property and a copy of the recorded conservation easement furnished to the Corps.

(13)  The permittee shall comply with the attached Eastern Indigo Snake Construction Precautions.

(14)  Within 90 days of permit issuance, the permittee shall restrict the discharge to the C-18 Canal through the modification of the existing gravity discharge structure from the impoundment to the C-18 Canal.  The permittee shall install an additional weir plate and remove the pump that currently discharges from the ditches directly into the C-18.

(15)  Within 60 days of the authorized work and completion of the mitigation, the attached Self-Certification Statement of Compliance must be completed and submitted to the Corps.  Mail the completed form to the Regulatory Division, Enforcement Section, Post Office 4970, Jacksonville, Florida 32232-0019.

10.  Public interest review:

    a.  Public interest factors: The Corps reviewed all of the public interest factors.  The Corps considers the public interest factors identified below as relevant to this proposal. The Corps considered both cumulative and secondary impacts on these public interest factors.

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

(1)  Conservation:  On the subject site, the applicant
will remove exotics, plant wetland plant species, provide
maintenance, and place 6.6 acres of littoral shelves under a
conservation easement.  The native upland buffer areas will also
be placed under a conservation easement.  Secondary impacts
pertaining to the on-site conservation areas not expected to be
adverse because they pertain to littoral areas surrounding a
surface water management pond.  Best management practices will
be used during construction.

(2)  Economics:  The project would create an increase in
jobs for all aspects of construction (land clearing, masonry,
roofers, nurseries, etc.) for the immediate on-site construction
needs.  The overall development of the site with the SCRIPPS
research biotechnological park would be a considerable economic
benefit to the area.  The SCRIPPS research park is estimated to
accommodate approximately 18,000 jobs on the site.  An increase
in available jobs, greater educational opportunities, and more
health care facilities would encourage economic growth in the
area.  As signed by Governor Jeb Bush, this project was
expedited by the State based on an economic benefit to the area.
The economic disadvantage would be less production of
agriculture (i.e., orange groves) and less sand excavated.
Since the orange groves and sand mine consist of approximately
1,919 acres in total, approximately 28% of the total production
would not be used for agricultural purposes under this permit
decision.

(3)  Aesthetics:  As the site is currently an orange
grove and sand mine, construction of a research park may be more
aesthetic to the area, based on the Corps' opinion.  Surface
water would be contained in the management ponds, which have
been designed to include a large amount of wetland plantings,
including cypress and bay islands.  The SCRIPPS development
would have active orange groves on almost three sides, with a
surface water management pond located to the south.  The pond
and littoral plantings (including bays and cypress trees) would
serve to buffer the residential development from the SCRIPPS
development, as well as provide an appealing view.  The

-42-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

applicant has also agreed to preserve a minimum of 150-foot
vegetated buffer located between the stormwater pond and the
development in the Acreage.  This buffer would be native
planted, upland area with a recreational trail.  Undeveloped
private land (the Vavrus Ranch) exists to the east.  Since the
site is not developed, the aesthetics would not be an issue.
However, the applicant is preserving and planting a 50-foot
native upland buffer adjacent to the Vavrus Ranch.  For
cumulative effects, the aesthetics would be similar to the
secondary effects since no permit decisions have been made to
allow further development to occur on the remaining Mecca Farms
parcel or the Vavrus Ranch.  If development were allowed to
continue on the adjacent private property, those areas would
appear to look as the other developed areas in Palm Beach
County.

     (4)  General environmental concerns:  There are no
outstanding general environmental concerns that have not been
addressed.

     (5)  Wetlands:  Only low ecological value wetland
fringes on the ditches would be impacted as a result of the
project.  Impacts are to surface water ditches only.  However,
secondary effects on the wetlands adjacent to the site on the
Vavrus Ranch have been assessed and calculated using the WRAP
method.  A WRAP score of 0.77 has been assessed for the wetland
located southeast of the site.  This accounts for existing
conditions, with the wetland being located adjacent to the
orange groves.  With the project being constructed as proposed,
the wetland has a WRAP of 0.72.  The loss accounts for the
decrease in wildlife utilization and the decrease in buffer
resulting from a disconnection to wildlife corridors.  To offset
this loss in function and value, the Corps has requested that
the applicant provide a minimum 50-foot, native, upland planted,
wildlife corridor to serve as a buffer to the adjacent wetlands
on the Vavrus site.

     (6)  Historic and cultural resources: The SHPO responded
to the public notice on 15 October 2004, stating that there are

-43-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

no concerns with the project.  The Corps is unaware of any
secondary or cumulative impacts this project may have on
historic and cultural resources.

    (7)  Fish and wildlife values:  Secondary impacts to
fish and wildlife values include displacement of the wildlife
during construction.  During the construction phase of the
project, the fish and wildlife species would theoretically move
to the ditches that are not being impacted.  Once the stormwater
ponds are constructed, fish, aquatic invertebrates, and other
wildlife are anticipated to utilize the ponds.  A temporal lag
is anticipated and accounted for in the WRAP analysis.  To
offset secondary impacts to fish and wildlife utilizing adjacent
wetlands, a native upland buffer has been incorporated into the
project to allow a wildlife corridor to remain to the northern
and western adjacent properties.  The northern property,
although is an active orange grove and water retention basin,
borders undeveloped land that may be is prime foraging and/or
nesting habitat for many endangered species including wood
storks, peregrine falcons, bald eagles, Audubon's crested
caracaras, and snail kites.  The western adjacent property is
the J.W. Corbett Wildlife Management Area, which would contain
similar species.  These native upland wildlife corridors will be
maintained and preserved in perpetuity.

    (a)  FWS/NMFS/FWCC comments:  The FWS concurred with the
Corps' determination that the project may affect but is not
likely to adversely affect the eastern indigo snake and the
woodstork by letter dated 22 September 2004.  The FWS has no
objections to the issuance of the permit, but recommended that
the Corps coordinate overall project planning with the
Everglades Restoration Program and ensure a "no net loss"
wetland policy.  The Corps has coordinated with the CERP program
and has ensured through the WRAP process that the project will
result in a "no net loss" of wetlands or waters of the United
States.

The NMFS provided comments to the project on 10 September 2004.
The NMFS raised concerns with secondary and cumulative effects,

-44-

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

further development of adjacent properties, avoidance and
minimization, appropriate mitigation, prior converted wetlands,
and evaluation of direct and indirect impacts as a result of the
project. The Corps believes that all of the NMFS' concerns have
been addressed and resolved. The Corps has evaluated secondary
and cumulative effects as described in this SOF. The Corps
believes that this project has independent utility from the
remaining planned development. Therefore, the Corps will
evaluate any cumulative impacts associated with future potential
development on adjacent property, the Vavrus Ranch, new road
construction, or supporting projects (new exits on the
interstate I-95 or the Florida Turnpike, tri-rail extension…)
when applications are received that trigger their review.
Avoidance, minimization, and mitigation have been addressed in
8(a), (b), and (c). The Corps has assessed the mitigation and
believes that construction of surface water ponds with a
littoral fringe is appropriate mitigation for impacts to surface
water ditches with a narrow fringe of wetland plant species.
The Corps also evaluated indirect impacts to adjacent wetlands
on the Vavrus Ranch. As a result, vegetative buffers were
incorporated into the project to provide added protection and
offset the loss of function and value from the change in
buffers. The historical wetlands on the site have been
previously impacted through agricultural use, which is
authorized by NRCS under an agricultural exemption. Therefore,
the Corps is not evaluating the impacts associated with the
historical wetlands. The Corps has claimed jurisdiction of the
agricultural ditches because they are connected to, and
tributary to, the C-18 Canal through a weir at the control
station at the north end of the Mecca Farms property.
Therefore, the Corps will require mitigation for the
agricultural ditches.

The FFWCC did not send comments to the Corps or the FWS.
However, in a phone conversation with the FWS on 7 December
2004, the FWS conveyed the FFWCC's concerns as they understood.
The FFWCC's concerns included secondary and cumulative effects
as well as reference to preclude unauthorized take of a State-
listed species. The Corps has addressed secondary and

-45-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

cumulative effects of the project in the response to the NMFS'
concerns above.  The FFWCC stated to the FWS that neither the DA
permit nor the SFWMD permit should authorize a take of a listed
species.  The Corps does not believe that the DA authorization
would authorize a take of a listed species.  The EA performed on
the site on 8 April 2004, indicated that the site did not
contain any listed species with the exception of the American
alligator (listed as threatened by similarity of appearance to
an American crocodile).  However, the potential for listed
species to occur on the site exists.  The Corps evaluated the
list and believed that the wood stork was the only species that
would use the site since it is an active orange grove and sand
mine.

     (b)  Anticipated/known impacts:  All known impacts have
been evaluated, avoided, minimized, and mitigated.  For the
anticipated impacts, if and when development is proposed in the
future for adjacent properties, the Corps will evaluate those
permit applications as they are submitted.

     (8)  Flood hazards:  There are no pre-development
conditions that indicate a flood-prone area.  The applicant has
confirmed this with the Palm Beach County Engineering Department
and the FEMA.  The property has hydrologically contained surface
water from the adjacent properties through the use of the
perimeter berms and irrigation ditches.  The site has been
designed and approved by the South Florida Water Management
District to have an acceptable flood control with their surface
water management pond storage capacity.  Issuance of a SFWMD
permit ensures that the project has adequate water storage to
prevent flooding.

     (9)  Floodplain values:  N/A

     (10)  Land use:  Currently, the land contains sand and
gravel pits, citrus groves, and reservoirs and is used for
agricultural and mining.  On 22 May 1997, the Palm Beach County
Board of County Commissioners approved the site for rezoning
that allowed an additional 225-acre excavation area for mining.

-46-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Secondary effects of the project would take active agricultural
lands out of orange production and sand mining.  The Board of
County Commissioners has also recently approved a zoning
amendment that approved the change in land use to support the
SCRIPPS development.

(11)  Navigation:  N/A

(12)  Shore erosion and accretion:  N/A

(13)  Recreation:  With the construction of the
biotechnological park on a portion of the Mecca Farms parcel, an
increase in recreational use may occur in the J.W. Corbett
Wildlife Management Park.  An increase in State funds would
occur with the increase in use.  Within the 150-foot upland
buffer located in the southern portion of the site, a nature
walk has been incorporated into the design plans to help
increase passive recreational use.

(14)  Water supply:  Existing wells supply potable water
for use at the current citrus operation.  The potable water and
wastewater services for the biotechnological research park will
be supplied by the Palm Beach County Water Utilities Department
(PBCWUD).  The PBCWUD stated that they have the ability to run
short-term and long-term potable water and wastewater service
requirements and have sufficient capacity in reserve to meet the
built-out demand of the biotechnological research park.

(15)  Water quality:  The increase in water control
elevation and the creation of lakes instead of ditches will
allow for additional water quality treatment, including settling
of sediments before entering into the impoundment.  The system
would detain the first 3 inches of runoff prior to discharge.
The existing gravity discharge structure from the impoundment to
the C-18 will be modified to restrict the discharge to the C-18
Canal, allowing additional water quality treatment within the
impoundment and an additional weir plate will be added.  Also,
the pump that currently discharges from the ditches directly
into the C-18 will not be used.  Best management practices,

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

including silt screen and turbidity barriers, will be used.  The
project is designed to meet or exceed state water quality
standards.  Issuance of the SFWMD permit ensures that the
project has water quality certification.  Secondary effects of
water quality would be temporary impacts during the construction
phase.  Best management practices would prevent any unacceptable
impacts from occurring.  Cumulative effects of water quality on
the C-18 Canal and ultimately the Loxahatchee River would be an
improvement from the existing conditions.

     (16)  Energy needs:  The Palm Beach County has a power
supply from the existing lines located to the south of the site
in the Acreage.  This power line is currently being used for the
residents in the Acreage.

     (17)  Safety:  Safety is not a concern with this
project.  All practicable measures will be taken during
construction to ensure public safety.

     (18)  Food and fiber production:  As stated above, the
site is an active orange grove.  Construction of the
biotechnological research park will take approximately 500 acres
out of orange production.  With the many other orange groves in
the south Florida area, this is not expected to have a
significant adverse effect the local orange production, economy,
or the interstate commerce.  Cumulative effects may promote the
remaining orange groves on the Mecca Farms site to also be taken
out of production.  Again, this is not expected to cause a
significant adverse effect.

     (19)  Mineral needs:  As stated above, the site is an
active sand mine.  Construction of the biotechnological research
park will take approximately 30 acres out of mining.  Because
the Palm Beach County Board of County Commissioners approved the
site for rezoning that allowed an additional 225-acre excavation
area for mining, the total impacts present and in the future
would remove approximately 255 acres of land from mining.  With
the other sand and rock mines in the south Florida area, this is
not expected to have a significant adverse effect the local sand

-48-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement of Findings for the Above-Numbered Permit Application

---

availability, the economy, or the interstate commerce. Cumulative effects may deter the remaining orange groves on the Mecca Farms site to be converted to sand mines. Again, this is not expected to cause a significant adverse effect.

(20) Considerations of property ownership: The site was privately owned and utilized as agricultural (an orange grove and sand mine). The landowner has the choice to change the land use and utilize the site as industrial, commercial, or residential, or even as preservation. Palm Beach County has now acquired the land for use to develop SCRIPPS, or to sell off for residential and commercial development. The Corps' responsibility is to process the permit application and evaluate the proposal according to Section 404 of the Clean Water Act of 1972, as amended. As a result of the public notice, the Corps has received several adverse comments from nearby landowners and interested parties. The majority of the commenters objected to the SCRIPPS development. Many of the property owners in the Acreage and Loxahatchee have constructed their home on what used to be the same quality of land that surrounds the Mecca Farms parcel. The difference is that the Mecca Farms parcel is already impacted through agriculture.

b. Describe the relative extent of the public and private need for the proposed structure or work: Public needs include employment opportunities, educational opportunities, and a potential increase in the local tax base. The SCRIPPS is meeting the need for additional biotechnological research in the country and would be the first SCRIPPS facility on the east coast. The SCRIPPS is a part of the country's largest private, non-profit public benefit research organizations, which promotes the betterment of health and human conditions with an emphasis on educational opportunities. Economic as well as quality of life benefits are expected to occur in the general area as a result of new jobs being created, home sales and homes being constructed, and potential future development of a town center with retail stores, the operation a local hospital, and educational opportunities for the public. Since the Palm Beach County elementary and high schools are currently operating at

-49-

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

over 100% capacity, new schools are needed.  With the
construction of a campus for higher education, the public would
have another option to receive a degree from a local university.
A local hospital on the western part of the Palm Beach County
would also benefit the public.  Private needs include property
ownership, land use, and economic return on the property.

    c.  Describe the practicability of using reasonable
alternative locations and methods to accomplish the objective of
the purposed work where there are unresolved conflicts as to
resource use:  The site currently supports agricultural use.
However, the Development of Regional Impact and the Planned
Industrial Park Development approved the SCRIPPS project.  This
was ratified in the Palm Beach County Resolution that approved
the development, Resolution R-2004-2101.  Therefore, the Board
of County Commissioners has approved a zoning amendment that
approved the change in land use.  Any conflicts resulting from
the change in resource use have been resolved by the Board of
County Commissioners' zoning amendment.  There are no unresolved
conflicts regarding resource use.


    d.  Describe the extent and permanence of the beneficial
and/or detrimental effects, which the proposed work is likely to
have on the public, and private uses to which the area is
suited:  Detrimental impacts are expected to be minimal although
they would be permanent in the construction area.  The
beneficial effects associated with utilization of the property
would be permanent.

    e.  Threatened or endangered species: The proposed project
will not adversely affect any threatened or endangered species.
The site currently is an active orange grove with frequent human
disturbance.  Little natural native habitat is available on
site.  The surrounding land contains orange groves, residential
development and natural land.  After visiting the site,
reviewing the Environmental Assessment (EA), and coordinating
with the FWS, the Corps determined that the project may affect,
but is not likely to adversely affect the woodstork provided the

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

mitigation offsets the function and value of the impacted
wetlands.  The FWS requested that the Corps make a determination
for the eastern indigo snake.  The Corps made a determination
that the project may affect but is not likely to adversely
affect the eastern indigo snake based on the inclusion of
protective measures as a special condition in our permit in the
event that one is found on the site.  The FWS concurred with the
Corps' determination on 22 September 2004, that the project may
affect but is not likely to adversely affect the eastern indigo
snake and the woodstork.  Therefore, the Corps believes that the
project would not adversely affect any threatened or endangered
species.  The Corps believes that the DA permit will not allow
an unauthorized take of a federally-listed species.

   f.  Corps wetland policy:  The only impacts to wetlands are
to low ecological value wetland fringes of the ditches as a
result of the project.  The proposed surface water alteration
i.e., filling of 21.3 acres of ditches, is necessary to realize
the project purpose.  The proposed work should result in minimal
adverse environmental impacts.  The benefits of the project
would outweigh the minimal detrimental impacts.  The WRAP
performed on the site indicates that the mitigation would exceed
the function and value of the impacted ditches.  Therefore, the
project is in accordance with the Corps wetland policy.

   g.  Cumulative and Secondary Impacts:  As stated previously,
the Corps is aware of potential plans to develop the remaining
1,365-acre Mecca Farms parcel and the Vavrus Ranch, as well as
construct several new roads to access the future proposed
development.  The Corps believes that the proposal to construct
a 535-acre biotechnology research park has independent utility
from the remaining planned development on the 1,919-acre Mecca
Farms site, from the development on the Vavrus Ranch, and the
construction of the future roads because the biotechnology
research park could be constructed solely, without the need for
the remaining development or roads.  The construction of the
SCRIPPS portion of development will go forward without any
additional development.  Therefore, the cumulative impacts
assessment will consider the fact that a permit decision has not

-51-

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

been made on the remaining Mecca Farms Parcel, the planned
development on the Vavrus Ranch, nor any associated roads or
future projects.

For cumulative effects, the SCRIPPS development on the Mecca
Farms parcel may promote further development on the remaining
Mecca Farms parcel.  Although no permit applications have been
received and no permit decisions have been made to allow further
development to occur on the remaining Mecca Farms parcel or the
Vavrus Ranch, if development were allowed to continue on the
adjacent private property, impacts could occur to the surface
water ditches and the water catchment area to the northeast of
the Mecca Farms site, as well as any possible wetland impacts on
the Vavrus Ranch.  The Corps decision being made on the SCRIPPS
Biotechnical Research Park does not preclude options to provide
for continued protection of important aquatic resources on
Vavrus Ranch, nor the movement of water from the south to C-18
canal or the Loxahatchee Slough.  Indeed, the decision leaves an
approximately 900 foot wide area on the western portion of Mecca
Farms west of the project for just such purpose in the future.
The Corps would evaluate any off-site ditch or wetland impacts
for DA jurisdiction.  Mitigation would be required for any ditch
or wetland impacts, only if the applicant has first demonstrated
avoidance and minimization.

The site is currently impacted from agricultural and mining use.
Changing the use to commercial/institutional/residential does
not appear to have any significant adverse secondary or
cumulative impacts associated with the change in land use.  The
site is bordered by active orange groves and undeveloped public
land (Unit 11 Hungryland Slough) to the north, undeveloped
private land to the east, an active orange grove and residential
development to the south, and Seminole-Pratt Whitney Road
(unimproved) and J.W. Corbett Wildlife Management Park to the
west.  For cumulative impacts on adjacent conservation areas, it
is anticipated that development on the 535-acre site would
encourage development to be proposed on the remaining Mecca
Farms parcel as well as the remaining adjacent private lands,
including the Acreage, Loxahatchee, and the Vavrus Ranch.  The

-52-

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Corps is also aware that the Florida Power and Light has plans
to construct a power substation on a portion of the J.W. Corbett
Wildlife Management Area to supply power to the future
development on the 1,919 acres of Mecca Farms.  This plan
includes a land trade between J.W. Corbett and the Palm Beach
County, which would allow the Palm Beach County to own property
that would allow a connection of Seminole Pratt Whitney Road to
Beeline Highway.  This land trade would give the Palm Beach
County the required access to Beeline Highway, thus increasing
the roadways.  Any future plans development in these areas or
other public lands that requires the DA authorization will be
evaluated and processed by the Corps under a separate
application once it is submitted.

The land use in the adjacent Vavrus Ranch would continue to be
residential and agricultural; however, further development may
occur.  The land use in the remaining orange groves on the Mecca
parcel could possibly change to residential, industrial, and
commercial as a cumulative impact.  The potential exists for
development to occur on Mecca and the Vavrus Ranch properties
because the properties are in private ownership, and Palm Beach
County could, and has stated they will, sell portions of Mecca
Farms for development.  At some point in time, the Corps
anticipates applications to be submitted that propose
development on these sites whether the biotechnology research
park would be constructed on the Mecca Farms parcel or not. The
Corps can not be certain whether authorizing the SCRIPPS
development would result in such proposed development sooner, or
not.  With the intense development pressure in northern Palm
Beach County, the timing of any development applications may be
very similar with or without SCRIPPS on Mecca Farms.
Development pressure on Vavrus Ranch would likely be very
similar if SCRIPPS were built on the Briger Tract, Parcel 19 or
the Park of Commerce.  The Corps and EPA conducted an Advanced
Identification of Disposal Sites study of the Loxahatchee Slough
several years ago, and identified substantial areas of Vavrus
Ranch as "developable". However, development on these parcels
could only occur if a permit application were submitted,
evaluated, and if the Corps finds it to be appropriate,

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

authorized wetland impacts.  The land use in the public lands
would not change.

The lands that are currently preserved, i.e., Unit 11 Hungryland
Slough and the J.W. Corbett Wildlife Management Park, would not
be developed because they are publicly owned and preserved as
conservation/environmentally sensitive lands.

When considering cumulative impacts on economics, development of
the site with the SCRIPPS research biotechnological park would
be a considerable economic benefit to the area.  The SCRIPPS
research park is estimated to accommodate approximately 18,000
jobs on the site.  An increase in available jobs, greater
educational opportunities, and more health care facilities would
encourage economic growth in the area.

The loss of oranges and sand in the area may have an effect on
the supply and cost of those products to grocery stores and
construction supply companies.  The cumulative effects of the
land use change include development of the neighboring
residential areas.  The Acreage currently has approximately
35,000 residential homes; however, if the project is
constructed, the population could increase to 50,000 residential
homes in the Acreage.  Although the land use in the Acreage
would remain the same, approximately 15,000 new single-family
residents may possibly move into the area.

For water supply, secondary effects may lessen the drawdown
effects that the existing wells are doing.  Cumulative effects
include possible water supply to residents in the Acreage and
nearby residents.  When evaluating the water quality, secondary
effects would be temporary during the construction phase.  Best
management practices would prevent any unacceptable impacts from
occurring.  Cumulative effects of water quality on the C-18
Canal and ultimately the Loxahatchee River would be an
improvement from the existing conditions.

    h.  Corps analysis of comments and responses:  A summary of
the comments received following the public notice is discussed

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

in Section 7.  Some of the comments pertain to the development
on the remainder of the Mecca Farms parcel as well as on the
adjacent privately owned lands.  The Corps believes that this
project is independent from those future plans and will review
any possible plans when the permit applications are submitted.
The future proposed developments were considered in a cumulative
impacts analysis as a possible, potential impact, but only if
the Corps receives an application for a project which would
require a road to access the future sites or remaining Mecca
Farms site.  Considering the Corps does not have an application
that proposes new road development, the analysis pertaining to
adverse impacts from the new development on surrounding lands is
not feasible.  The Corps has considered comments pertaining to
buffers along the Vavrus Ranch property.  An analysis was
performed to determine the current function and value of the
adjacent wetlands with a citrus grove bordering them, and an
analysis of the future function and value with the research park
bordering the wetlands.  Since the analysis showed a slight
impact resulting from the development, the Corps requested that
the applicant provide a native, vegetated upland buffer along
the edge of the Mecca property to offset that loss.  The
applicant would also preserve a 150-foot native upland buffer
between the southern stormwater pond and the existing
residential development in the Acreage.  This was designed to
alleviate some of the public concerns with aesthetics.  The
Corps has analyzed all of the comments received and feels that
they are resolved.

11.  Essential Fisheries Habitat (EFH): The project would not
adversely affect Essential Fish Habitat because water quality
will be improved in the C-18 Canal and ultimately the
Loxahatchee River.  The impacts are to surface water ditches,
which have a low function and value.  The creation of the
surface water management ponds with the littoral plantings will
offset any impacts from the loss of the ditches and provide
better habitat, as shown in the WRAP assessment.  Therefore, the
Corps believes that the intent of the Magnuson-Stevens Fishery
Conservation and Management Act has been met.

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

12.  Public Hearing Evaluation:  A public hearing would serve to
discuss issues and concerns that have not been identified and
resolved concerning the project or to evaluate new information
that has been received.  Several commenters raised concerns with
the project, as discussed in 7c.  The only concern that was
unresolved at that time was secondary effects to the off-site
wetlands on the Vavrus Ranch.  The Corps incorporated a 50-foot
buffer to offset the impact.  The Corps believes that all issues
have been adequately identified and addressed through the permit
evaluation process and all issues have been resolved.  The
public has had numerous opportunities to provide written and
oral comment on this project through meetings where the public
was invited and public meetings held by Palm Beach County.  The
Corps has attended some of the meetings and heard the public
comments, which mirror in every way the written comments the
Corps has received on its public notice.  The Corps public
notice comment period was extended because of the hurricanes.
Since all of the comments received following the public notice
have been alleviated and no new information has been presented
that would change our decision, the Corps believes that a public
hearing is not needed or required.

13.  Determinations:

     a.  Finding of No Significant Impact (FONSI): Having
reviewed the information provided by the applicant and all
interested parties and an assessment of the environmental
impacts, I find that this permit action will not have a
significant impact on the quality of the human environment.
Therefore, an Environmental Impact Statement will not be
required.

     b.  Compliance with 404(b)(1) Guidelines: Having completed
the evaluation in paragraph 8 above, I have determined that the
proposed discharge complies with the 404(b)(1) guidelines.

     c.  Section 176(c) of the Clean Air Act General Conformity
Rule Review: The proposed permit action has been analyzed for
conformity applicability pursuant to regulations implementing

Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2859(IP-AAZ)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Section 176(c) of the Clean Air Act.  It has been determined
that the activities proposed under this permit will not exceed
de minimis levels of direct or indirect emissions of a criteria
pollutant or its precursors and are exempted by 40 CFR Part
93.153.  Any later indirect emissions are generally not within
the Corps' continuing program responsibility and generally
cannot be practicably controlled by the Corps.  For these
reasons a conformity determination is not required for this
permit action.

    d.  Public Hearing Request: I have reviewed and evaluated
the requests for a public hearing.  There is sufficient
information available to evaluate the proposed project;
therefore, the requests for a public hearing are denied.

    e.  Public Interest Determination: I find that issuance of a
Department of the Army permit is not contrary to the public
interest.

PREPARED BY:

Alisa A. Zarbo
Project Manager
South Permits Branch

REVIEWED BY:                    APPROVED BY:

John F. Studt                   Robert M. Carpenter
Chief, South Permits            Colonel, Corps of Engineers
Branch                          Commanding

                        Intermediate Version: August 16, 2001

CESAJ-RD-SS SAJ-2004-2959(IP-AAZ)
SUBJECT:   Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

_____

    e.   Public Interest Determination: I find that issuance of a
Department of the Army permit is not contrary to the public
interest.


PREPARED BY:


*Alisa Zarbo*

Alisa A. Zarbo
Project Manager
South Permits Branch

REVIEWED BY:                         APPROVED BY:


*John F. Studt*                      *Robert M. Carpenter*

John F. Studt                        Robert M. Carpenter
Chief, South Permits                 Colonel, Corps of Engineers
Branch                               Commanding

*EXHIBIT "B"*



*EXHIBIT "C"*

2 of 5 DOCUMENTS

**LORETTO O'REILLY, JR. VERSUS UNITED STATES ARMY CORPS OF ENG'RS**

**CIVIL ACTION NO. 04-940 SECTION "A" (5)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2004 U.S. Dist. LEXIS 15787; 59 ERC (BNA) 1490*

**August 10, 2004, Decided**
**August 10, 2004, Filed, Entered**

**DISPOSITION:** [*1] Plaintiffs' Motion for Summary Judgment on Standing and Merits GRANTED. Permit issued by Department of Army ENJOINED; Defendant's Motion for Summary Judgment DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Both plaintiffs and defendant, the United States Army Corps of Engineers (Corps), moved for summary judgment in an action challenging a permit issued by the Corps to a property owner pursuant to § 404 of the Clean Water Act (CWA), *33 U.S.C.S. § 1344*(a), for the purpose of creating a residential development.

**OVERVIEW:** Plaintiffs brought an action challenging a permit issued by the Corps pursuant to the CWA. The permit authorized a property owner to dredge and fill 81.58 acres of land, 39.54 acres of which were protected wetlands. The property owner intended to create a residential development on the site. Both parties moved for summary judgment. The court found that the record contained no support for the conclusion of the Corps that the mitigation measures would remove or reduce the identified adverse impacts of the project. The failure of the Corps to employ any analysis or gather any data with respect to its mitigated Finding of No Significant Impact (FONSI) rendered its decision arbitrary or capricious. The Corps also abused its discretion in failing to give an in-depth analysis to the cumulative effects of the project. In light of the long-term and irreversible environmental impacts associated with the project, the action of the Corps was wholly at odds with the National Environmental Policy Act (NEPA). Accordingly, the court held that because the permit was issued without an Environmental Impact Statement (EIS) in violation of NEPA, plaintiffs were entitled to an injunction.

**OUTCOME:** The court granted plaintiffs' motion for summary judgment. The court enjoined the permit issued by the Corps to the property owner. The court denied the motion for summary judgment filed by the Corps.

**LexisNexis(R) Headnotes**

*Environmental Law > Water Quality*
*Environmental Law > Natural Resources & Public Lands > Wetlands Management*
[HN1] Section 404 of the Clean Water Act authorizes the United States Army Corps of Engineers to issue permits for the discharge of dredged or fill material into the navigable waters of the United States. *33 U.S.C.S. § 1344*(a). Wetlands are considered navigable waters subject to the permitting process.

*Environmental Law > Environmental Quality Review*
*Environmental Law > Water Quality*
[HN2] The National Environmental Policy Act (NEPA) is a separate piece of federal legislation designed to force federal agencies to consider the environmental impacts of their actions, i.e., issuing a permit under § 404 of the Clean Water Act.

*Environmental Law > Environmental Quality Review*
[HN3] The National Environmental Policy Act (NEPA) establishes a national policy to encourage productive and enjoyable harmony between man and his environment, and is intended to reduce or eliminate environmental

damage and to promote the understanding of the ecological systems and natural resources important to the United States. NEPA itself does not mandate particular results in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.

*Environmental Law > Environmental Quality Review*
[HN4] The National Environmental Policy Act (NEPA) dictates that federal agencies undertaking major federal actions significantly affecting the quality of the human environment must prepare a detailed statement on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects that cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. *42 U.S.C.S. § 4332(2)(C)*. This detailed statement is called an Environmental Impact Statement (EIS).

*Environmental Law > Environmental Quality Review*
[HN5] On occasion, a permitting agency will issue a Finding of No Significant Impact (FONSI) and decline to prepare an Environmental Impact Statement (EIS) notwithstanding that the proposed project will have significant environmental impacts. In such a situation, the permittee agrees to employ "mitigation measures" that will lower the otherwise significant impacts of an activity to a level of insignificance. In this way, a FONSI can issue for an activity that otherwise would require the preparation of a full-blown EIS. Courts expressly approve of the use of a so-called "mitigated FONSI."

*Environmental Law > Litigation & Administrative Proceedings > Judicial Review*
[HN6] An agency's decision not to prepare an Environmental Impact Statement (EIS) can be set aside only upon a showing that it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *5 U.S.C.S. § 706(2)(A)*.

*Environmental Law > Environmental Quality Review*
*Environmental Law > Litigation & Administrative Proceedings > Judicial Review*
[HN7] The discretion afforded the United States Army Corps of Engineers (Corps) under the law to make a mitigation determination does not mean that a decision is unimpeachable simply because the Corps has reached a particular conclusion. The Corps must provide enough

analysis and data so that a reviewing court can insure that the Corps has complied with the National Environmental Policy Act (NEPA).

COUNSEL: For LORETTO O'REILLY, JR, KELLY FITZMAURICE, HAZEL SINCLAIR, plaintiffs: Karla Ann Raettig, Josh Borsellino, Tulane Environmental Law Clinic, New Orleans, LA.

For UNITED STATES ARMY CORPS OF ENGINEERS, defendant: Robert David Northey, U. S. Army Corps of Engineers Office of Counsel, Sharon Denise Smith, U. S. Attorney's Office, New Orleans, LA.

For UNITED STATES ARMY CORPS OF ENGINEERS, defendant: Devon M. Lehman, U. S. Department of Justice, Lois Godfrey-Wye, U.S. Department of Justice, Washington, DC.

For ERIC A BOPP, intervenor: Walter R. Woodruff, Edward S. Bopp, A Law Corporation, Arabi, LA.

JUDGES: JAY C. ZAINEY, UNITED STATES DISTRICT JUDGE.

OPINIONBY: JAY C. ZAINEY

OPINION:

### ORDER AND REASONS

Before the Court are **Plaintiffs' Motion for Summary Judgment on Standing and the Merits (Rec. Doc. 16) and Defendant's Motion for Summary Judgment (Rec. Doc. 12).** Intervenor, Eric A. Bopp, has adopted and joined in Defendant's [*2] motion. Both motions are opposed. The motions, set for hearing on July 28, 2004, are before the Court on the briefs without oral argument. For the reasons that follow, Plaintiffs' motion is GRANTED and Defendant's motion is DENIED.

### I. BACKGROUND

Plaintiffs filed this suit challenging a permit issued by the defendant, the U.S. Army Corps of Engineers ("the Corps") pursuant to *§ 404 of the Clean Water Act ("CWA")*. The permit authorizes the permittee, August Hand, Jr., n1 to dredge and fill 81.58 acres in St. Tammany, Parish. Mr. Hand intends to create a residential development on the site. 39.54 of the total acreage is protected pine flatwood/savannah wetlands.

n1 Mr. Hand is a representative member of the Planche family who currently owns the property.

The permitting process originally began in 1999 when the applicant sought to dredge and fill 147 acres, 91.94 acres of which were wetlands. That application described development of a subdivision in three phases. The applicant later withdrew that application [*3] and Mr. Hand submitted a revised application in September 2000. The revised application was for 81.58 acres, which included the 39.54 of regulated wetlands at issue here. The project was termed "Phase 1 of Timber Branch II." A public notice went out and comments were received.

In December 2003, the Corps issued the § 404 permit. The Corps performed an Environmental Assessment ("EA") in lieu of an Environmental Impact Statement ("EIS") based upon its conclusion that the proposed development would not have a significant impact on the environment in light of the mitigation measures upon which the permit was conditioned. In other words, the Corps issued a mitigated "finding of no significant impact" or "mitigated FONSI."

Plaintiffs filed this suit seeking to enjoin the permit. They claim that the permit was illegally issued because the Corps did not prepare an EIS, that the Corps did not consider the cumulative effects of the permit, and that the LDEQ water qualification certification, which is a prerequisite to the issuance of a § 404 permit, was subsequently invalidated in a state court proceeding.

On June 30, 2004, the parties, including the Intervenor, participated in oral argument [*4] before this Court regarding Plaintiffs' motion for a preliminary injunction. At the hearing, the Corps informed the Court that it was not contesting Plaintiffs' standing to bring this suit, and based upon the Corps' motion for summary judgment, that position has not changed. The parties also confirmed that the Court's resolution of this matter is to be based solely upon the administrative record developed by the Corps without consideration of new evidence. Finally, because the Court's decision is to be based solely upon the administrative record and applicable law, the parties agreed that this matter is appropriate for determination via cross motions for summary judgment.

## II. DISCUSSION

### 1. The Parties' Contentions

Plaintiffs contend that the Corps' decision to issue the permit without the benefit of an EIS was arbitrary and capricious. Plaintiffs argue that the Corps's EA does not address the cumulative impacts of the project in light of past and reasonably foreseeable development. In particular, Plaintiffs point out that the Corps has issued a total of 87 permits within a three mile radius of the proposed site and that Phases II and III of the Timber

Branch II [*5] development are reasonably foreseeable. Plaintiffs also argue that the Corps' EA describes the significant environmental impacts associated with the project yet the EA merely recites the offsetting mitigation measures without analyzing how those mitigation measures will actually reduce or offset the significant impacts to acceptable levels. n2

n2 Plaintiffs also argue that the permit was unlawfully issued because the state water quality certification upon which it was based had been subsequently vacated. On July 30, 2004, the Intervenor filed into the record a water quality certification dated July 28, 2004, which was issued by the Louisiana Department of Environmental Quality. Based on the newly issued certificate, the Court concludes that Plaintiffs' argument with respect to the vacated water quality certification is now moot. Therefore, the Court need not address this issue.

In opposition, the Corps and Intervenor argue that Plaintiffs have failed to show that the Corps' decision not to conduct an EIS was [*6] arbitrary, capricious, or contrary to law. The Corps argues that its decision to prepare an EA in lieu of an EIS was reasonable. According to the Corps, any significant environmental impacts are being compensated for and mitigated through a host of mitigation measures. The Corps argues that the mitigation measures were adequately addressed in the EA.

The Corps further argues that the depth of its consideration of the cumulative impact of the project was appropriate. While Plaintiffs contend that the project is only Phase I of III, the Corps points out that the permit is limited only to Phase I, and that any other development requires completely new and separate permitting. The Corps points out that Phase I has nothing to do with any future aspects of the project, which are wholly speculative at this stage, and that the project therefore has independent utility apart from any future phases of the project.

### 2. Applicable Law and Legal Analysis

[HN1] Section 404 of the Clean Water Act authorizes the Corps to issue permits for the discharge of dredged or fill material into the navigable waters of the United States. 33 U.S.C.A. 1344(a) (West 2001). Wetlands [*7] are considered navigable waters subject to the permitting process. See Tull v. United States, 481 U.S. 412, 414, 95 L. Ed. 2d 365, 107 S. Ct. 1831 (1987).

[HN2] The National Environmental Policy Act

("NEPA") is a separate piece of federal legislation designed to force federal agencies to consider the environmental impacts of their actions, i.e., issuing a *§ 404* permit. The Supreme Court recently explained NEPA as follows:

> Signed into law on January 1, 1970, [HN3] NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. "NEPA itself does not mandate particular results" in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.

*Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 159 L. Ed. 2d 60, 124 S. Ct. 2204, 2209 (2004)* (citations omitted).

[HN4] NEPA dictates that federal agencies [*8] undertaking "major Federal actions significantly affecting the quality of the human environment," must prepare a detailed statement on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *42 U.S.C. A. § 4332(2)(C) (West 2003)*. This detailed statement is called an Environmental Impact Statement or EIS. *Dep't of Transp., 124 S. Ct. at 2209.*

[HN5] On occasion, the permitting agency will issue a Finding of No Significant Impact or FONSI and decline to prepare an EIS notwithstanding that the proposed project will have significant environmental impacts. See *Spiller v. White, 352 F.3d 235, 241 (5th Cir. 2004)*. In such a situation, the permittee agrees to employ "mitigation measures" that will lower the otherwise significant impacts [*9] of an activity to a level of insignificance. Id. In this way, a FONSI can issue for an activity that otherwise would require the preparation of a full-blown EIS. Id. The Fifth Circuit has expressly approved of the use of a so-called "mitigated FONSI." Id.

[HN6] An agency's decision not to prepare an EIS can be set aside only upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id. at 2213* (citing *5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76, 104 L. Ed. 2d 377, 109 S. Ct. 1851 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 412, 49 L. Ed. 2d 576, 96 S. Ct. 2718 (1976)).*

In the instant case, the Corps does not challenge Plaintiffs' contention that its issuance of the *§ 404* permit is a "major Federal action" subject to NEPA. Further, the Court does not glean from the Corps' memoranda that the Corps is disagreeing with Plaintiffs' contention that there are significant environmental impacts associated with the proposed Timber Branch II project. Rather, the crux of the dispute is whether the Corps' FONSI, which was predicated upon the permittee agreeing [*10] to certain mitigation measures, was arbitrary, capricious, or an abuse of discretion.

As noted above, pretermitting mitigation, the Corps does not dispute that the proposed project entails significant environmental impacts. The Corps noted that the project would likely cause "substantial, long-term, adverse effects" to the project site substrate. R. 952 (Dep't of the Army Permit Evaluation and Decision Document). These adverse effects would likely result from anoxic and anaerobic conditions caused from redistribution of the native soils, chemical changes in the soil resulting from compaction, and decreased flood storage capability resulting from the addition of impervious materials for road surfaces, housing pads, etc. Id. Further, the site currently hosts a plethora of Louisiana aquatic organisms including various amphibians and reptiles. R. 957. Some species would be able to relocate into a designated 100 foot wide buffer zone around the proposed subdivision but many others would be completely eliminated. Id. These adverse impacts would be longterm but localized. Id. at 958.

The site is also home to a thriving wildlife habitat including deer, squirrels, rabbits, raccoons, [*11] songbirds, and other species far too numerous to mention. These inhabitants will have to relocate to areas adjoining the proposed subdivision but those dependent on forested wetland habitat would suffer long-term loss of breeding, foraging, and/or cover habitat. R. 958. Those able to relocate potentially face physiological stress because the smaller remaining habitat area will support few individuals. Id. The Corps concluded that the adverse effects to the wildlife habitat would be moderate to major. Id. The impacts would be long-term but localized. Id.

The Corps summarized that the proposed project would result in adverse secondary, cumulative, and

"induced" impacts to the local aquatic ecosystem in that *inter alia* wildlife and wetland habit would be destroyed and species diversity will be diminished. R. 963. The Corps noted that these aquatic impacts could be compounded when the cumulative effects of other developments and the inducement of additional support services in conjunction with Phase I are considered. Id.

The Corps recognized that the proposed project will add to the cumulative loss of wetland area in St. Tammany Parish and consequently diminishment [*12] of associated values of wetland functions. R. 964. The Corps also noted that when considered in conjunction with the potential for additional tentative phases of Timber Branch II, the cumulative effects would be major. Id. Further, each additional development of wetlands contributes to their increasing fragmentation. Id. Any future phases would add to the cumulative impact. R. 965.

Undoubtedly, the environmental impacts associated with the Timber Branch II project are significant even when future phases and cumulative impacts are not taken into consideration. No other conclusion could reasonably be reached based on the findings in the Corps' Decision Document. The question now is whether the Corps acted arbitrarily or capriciously or abused its discretion in concluding that the mitigation measures, upon which the permit was conditioned, reduced the otherwise significant impacts of the project to a level of insignificance. In making such a determination the Court cannot substitute its own judgment for that of the Corps' but can only ensure that the Corps has performed as mandated by Congress via NEPA. That said, the Court is persuaded that Plaintiffs' arguments have merit. [*13]

As noted above, issuance of the permit in the absence of an EIS was based solely upon the mitigation measures identified in the permit. Those mitigation measures include compliance with parish or local floodplain ordinances and regulations, a 100 foot vegetative buffer zone around the subdivision and the purchase of mitigation credits to compensate for any remaining and unavoidable adverse impacts associated with the project. R. 988-89. The permittee must also obtain separate approval from the Corps if the project requires work outside of that described in the permit. R. 988.

The Court agrees with Plaintiffs' contention that the administrative record contains no support for the Corp's conclusion that the mitigation measures would remove or reduce the identified adverse impacts of the project. Moreover, the EA contains little or no analysis or data with respect to the mitigation measures. Instead, the EA discusses the project's adverse impacts and describes the associated mitigation measures but nothing in the Document connects the two together. Without the collection or analysis of relevant data, the Court is left to assume that the Corps based its decision on speculation that the [*14] impacts would be successfully mitigated. For instance, one of the mitigating measures is that the permittee comply with all local flood plain ordinances and regulations. Not only does the Corps fail to explain how such compliance serves to mitigate the adverse environmental impacts, the Corps does not even enumerate the pertinent ordinances or reference what the contemplated ordinances require. [HN7] The discretion afforded the Corps under the law to make the mitigation determination in the first instance does not mean that a decision is unimpeachable simply because the Corps has reached a particular conclusion. The Corps must provide enough analysis and data so that a reviewing court can insure that the Corps has complied with NEPA. In short, the Corp's failure to employ any analysis or gather any data with respect to its mitigated FONSI rendered its decision arbitrary or capricious.

The Corps also abused its discretion in failing to give an in depth analysis to the cumulative effects of the project, including the potential Phases II and III of Timber Branch II. The Court agrees with Plaintiffs' contention that the EA merely recites the potential cumulative effects of the project in light [*15] of other wetlands destruction in the area but the EA is supported by no real analysis or data with respect to cumulative effects of this project. In light of the already 72 permits issues within a 3 mile radius of the project site, and the continued rapid growth and urbanization in St. Tammany Parish, the Corps acted arbitrarily or capriciously in concluding that the cumulative effects of the project were sufficiently mitigated.

Moreover, the Corps should have considered the other two phases of the Timber Branch II project. In 1999, when the property owners attempted to obtain permitting for the entirety of the three-phase project, the Environmental Protection Agency and the United States Fish & Wildlife Service recommended that the permit not be issued. Both agencies stated that the implementation of the activity may result in substantial and unacceptable impacts to aquatic resources of national importance. R. 966-967. The applicant's revised application, the one ultimately approved by the Corps and ultimately concurred in by those agencies, utilized the largest acreages of non-wetlands on the project site. R. 974. The Decision Document expressly notes that the other phases are a [*16] possibility and that the addition of those other phases would cause some cumulative effects to become "major." R. 964. In fact, the Corps devotes nearly an entire page of its Decision Document to addressing why it need not concern itself with Phases II and III given their "independent utility." R. 976.

The Corps cannot, however, consider Phase I in a vacuum under these facts. The Corps points to no obstacles, the permitting process aside, that have rendered Phases II and III impracticable, financially unattractive, or generally not feasible. The record blaringly suggests that the sole reason that Phases II and III were eliminated from the permitting application was to facilitate the issuance of the permit so that the project could get underway. The only conclusion to be reached based on the record is that Phases II and III are going to be financially viable in light of the expanding urbanization in St. Tammany Parish. Even though additional permitting would be required for Phases II and III, Phase I represents the proverbial "foot in the door" with respect to developing the entire project. In short, the other two phases are "reasonably foreseeable" and the current project represents [*17] a "piecemealing approach for implementing the totality of the Timber Branch II project." R. 976. Therefore, the Corps acted arbitrarily or capriciously in issuing the permit without considering the effect of the other two phases.

## III. CONCLUSION

The Corps acted arbitrarily, capriciously, or abused its discretion by issuing the § 404 permit without preparing a full EIS as required by NEPA. In light of the long-term and irreversible environmental impacts associated with this project, the Corp's action is wholly at odds with NEPA. Because the permit was issued without an EIS in violation of NEPA, Plaintiffs are entitled to an injunction.

Accordingly;

**IT IS ORDERED** that **Plaintiffs' Motion for Summary Judgment on Standing and the Merits (Rec. Doc. 16)** should be and is hereby **GRANTED**. The § 404 permit no. EC-19-990-2020-1 issued by the Department of the Army is hereby **ENJOINED;**

**IT IS FURTHER ORDERED** that **Defendant's Motion for Summary Judgment (Rec. Doc. 12)** should be and is hereby **DENIED.**

New Orleans, Louisiana, this 10th day of AUGUST, 2004.

JAY C. ZAINEY

UNITED STATES DISTRICT [*18] JUDGE

*EXHIBIT "D"*





**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

August 13, 2004

Colonel Robert M. Carpenter, District Engineer
Department of the Army
Jacksonville District Corps of Engineers
Attn: Alisa A. Zarbo
4400 PGA Boulevard, Suite 500
Palm Beach Gardens, FL 33410

SUBJECT:   Palm Beach County (Scripps Research Institute)
           SAJ-2004-2859 (IP-AAZ)

Dear Colonel Carpenter:

This letter provides comments from the U.S. Environmental Protection Agency (EPA) Region 4 regarding the proposed Scripps Research Institute. The applicant, Palm Beach County, proposes to construct a biotechnology research park with its supporting amenities within the County. The project would be built on 535 acres in the southeast portion of the 1,900 acre Mecca Farms site, which currently contains active orange grove and sand mining operations. Plans for development of other portions of Mecca Farms and the adjacent Vavrus Ranch sites are not included as part of the current application. The Mecca Farms site is located at the northeast corner of the intersection of Seminole Pratt-Whitney Road and 100th Lane North, adjacent to the C-18 Canal in Section 7 & 8, Township 42 South, Range 41 East, Palm Beach County, Florida.



The Mecca Farms site occurs in the watershed of a designated National Wild and Scenic River, the Northwest Fork of the Loxahatchee River. It is bounded on three sides by sites containing significant acreage of high value, natural wetlands. Two of these sites, J.W. Corbett Wildlife Management Park and Unit 11 of Hungryland Slough are protected in public ownership. According to the public notice, the 535 acre project site contains 486.1 acres of uplands, 27.6 acres of active sand quarry, and 21.3 acres of jurisdictional ditches. The ditches, which are permanently inundated, drain and irrigate the surrounding orange groves. They flow into a Mecca Farms reservoir, which discharges into the west branch of the C-18 Canal, a tributary of the Northwest Fork of the Loxahatchee River. The ditches contain narrow bands of littoral vegetation including cattail (*Typha* spp.), water pennywort (*Hydrocotyle* spp.), primrose willow (*Ludwigia peruviana*), and coontail (*Ceratophyllum demersum*), while the sparse vegetation in the quarry is limited to a few patchy areas which include cattail, torpedo grass (*Panicum repens*), maidencane (*Panicum hemitomon*), and water pennywort.

2

In July 1999, the EPA Regional Administrator, the U.S. Army Corps of Engineers (Corps) District Engineer, and the Treasure Coast Regional Planning Council Executive Director signed the *Loxahatchee River Basin Wetland Planning Project for Palm Beach County*. This planning document identified several issues of relevance to the current Scripps development proposal, which are described below. The Mecca Farms and Vavrus Ranch sites are strategically located in the Loxahatchee River Basin. The Mecca Farms site was historically underlain by Riviera sand hydric soils and the Vavrus Ranch site still contains significant, high value wetlands. The Loxahatchee River suffers from reduced hydrologic flows, because connections from certain wetland systems have been diverted from the drainage basin. The river could benefit from increased water storage in the watershed. Mecca Farms was identified as a potential site for a water storage reservoir, which could release water to the Northwest Fork of the Loxahatchee River during the dry season or periods of drought. Vavrus Ranch was identified as a site with significant wetlands in need of protection.

The applicant proposes to construct a 183 acre research institute, a 30 acre town center with commercial and multi-family residential housing, a 27 acre clinic/hospital, a 15 acre utility site, and three surface water management lakes totaling 87 acres. The site would also include 87 acres of upland hardwood forests and 93 acres of open space. This development would directly impact 21.3 acres of jurisdictional drainage ditches. Fill would be placed over 20.1 acres of ditches and dredging would occur in 1.2 acres of ditches. The existing open water quarry would be expanded from its current size of 27.6 acres to 48 acres. The applicant has offered to create littoral shelves along proposed stormwater treatment ponds to offset the proposed loss of aquatic resources.

We reviewed the public notice, conducted a site inspection on March 23, 2004, and participated in several pre-application meetings for the project. Based on this review, we have concerns that the project may not comply with the Section 404(b)(1) Guidelines, the implementing regulations for Section 404 of the Clean Water Act. These Guidelines require a sequential analysis of avoidance, minimization and compensatory mitigation before a federal wetlands fill permit can be issued. They also prohibit avoidable and/or significant adverse impacts to the aquatic environment.

Section 230.10(a) of the Guidelines prohibits discharge of dredged or fill material where there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem. We believe that less environmentally damaging alternatives may exist for this project. Although the current proposal will directly impact only 21.3 acres of jurisdictional drainage ditches, we are aware of plans to develop the rest of the Mecca Farms site, the adjacent Vavrus Ranch site and significant transportation additions through wetlands to provide access. We recommend that all needed biotechnology related development and site access be considered in the alternatives analysis. Given the high significance and quality of

3

wetlands on the Vavrus Ranch site, we are providing notification at this time that we believe practicable alternative sites are available for biotechnology related development that would cumulatively result in fewer impacts to wetland resources. Although we requested an analysis of alternative sites during the initial interagency meeting on March 10, 2004, we still have not received one. We continue to recommend that alternative sites be thoroughly reviewed and that potential cumulative effects be considered in selecting the least environmentally damaging practicable alternative.

Section 230.11 of the Guidelines requires a consideration of potential secondary and cumulative effects on the aquatic ecosystem prior to issuance of a federal wetlands fill permit. We are concerned that approval of this application could lead to piecemeal development of significant wetland resources for other biotechnology related growth. We recommend an assessment of all potential secondary and cumulative effects associated with this proposal, along with plans to compensate for these impacts. This assessment should address how the need for water storage and conveyance to the North Fork of the Loxahatchee River will be addressed should the Mecca Farms site be developed.

The Guidelines require compensatory mitigation for unavoidable impacts to aquatic resources. Although, the Mecca Farms site is currently an orange grove, there is evidence that the site previously contained natural wetlands. We recommend that the Corps determine whether or not the grove is considered prior-converted wetlands, so that the appropriate mitigation requirements can be established. We are also concerned that the proposed littoral shelves will not adequately compensate for the proposed 21.3 acres of impacts, that their habitat quality will be degraded due to their location along the edge of stormwater treatment ponds, that the potential ecological lift will be minimal, and that the mitigation wetlands will be non-jurisdictional. We recommend that the applicant provide documentation demonstrating that proposed mitigation wetlands will be located in jurisdictional waters that meet water quality standards, that they will provide viable habitat with a net ecological benefit that will be maintained in perpetuity, and that criteria for documenting success and contingency plans for mitigation failure are identified.

In conclusion, we believe that the permit for the project may not be approvable as proposed, because it does not comply with the Guidelines. We believe that this project has potential significant secondary/cumulative effects and that less environmentally damaging alternative sites may exist. In particular, we are concerned about potential significant wetland impacts that could be associated with development of the adjacent Vavrus Ranch site and transportation access. We also have concerns that the proposed mitigation will not adequately compensate for project impacts and will result in poor habitat.

4

Thank you for the opportunity to comment on this request for authorization.  If you should have any questions, please contact Veronica Fasselt at EPA's South Florida Office in West Palm Beach or by telephone at (561) 616-8867.

Sincerely,

Ronald J. Mikulak, Chief
Wetlands Regulatory Section

cc:    Jack Culpepper, FWS, Vero Beach
      Audrey Livergood, NMFS, Miami
      Damon Meiers, SFWMD (application number 040602-1), West Palm Beach
      Ron Ferris, Palm Beach Gardens

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

FLORIDA WILDLIFE FEDERATION;
and SIERRA CLUB, INC.

## DEFENDANTS

UNITED STATES ARMY CORPS OF
ENGINEERS; and COLONEL ROBERT M.
CARPENTER

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

05-80339

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
REINER & REINER, P.A.; 9100 So. Dadeland
Blvd., #1408; Miami, FL 33156; Ph.: 305-377-828

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, (PALM BEACH), MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

9:05 CV 80339- Dmm-Johnson

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | | A☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This is an action for declaratory and injunctive relief under 5 USC 702 and 28 USC 2201 and challenges the administrative decisions of the Defendant agencies with respect to their statutory obligations under NEPA and the CWA.

LENGTH OF TRIAL
via ___5 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
April 20, 2005.

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 533909   AMOUNT 250 00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____